WILENTZ, GOLDMAN & SPITZER P.A. (DT 8249)
Attorneys at Law
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
(732) 636-8000

    - and -

SMITH, SMITH & CURLEY, P.C. (RS 3234)
149 Avenue at the Common
Shrewsbury, New Jersey 07702
(732) 935-7246
Attorneys for Plaintiff Coast to Coast Entertainment, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

```
-----------------------------------------------X
                                     :
COAST TO COAST                       :
ENTERTAINMENT, LLC,                  :
                                     :          Civil Action
          Plaintiff,                 :
                                     :     Civil Action No.:
v.                                   :
                                     :            :
COASTAL AMUSEMENTS, INC.,            :
WU MAR HARNG ENTERPRISE,             :     VERIFIED COMPLAINT
LTD., WU MAR, INC., PAOKAI           :            AND
ELECTRONIC ENTERPRISE CO.,           :       JURY DEMAND
LTD., and NEW-TEC                    :
INDUSTRIAL COMPANY,                  :
                                     :
          Defendants.                :
                                     :
-----------------------------------------------X
```

Plaintiffs Coast To Coast Entertainment, LLC, with an address at 4000 Bordentown Avenue, Sayreville, Middlesex County, New Jersey, by and through counsel, for its Complaint against Defendants, Coastal Amusements, Inc., with an address at 1935 Swarthmore Avenue, Lakewood, New Jersey, Wu Mar Harng Enterprise, Wu Mar, Inc., Paokai Electronic Enterprise Co., LTD., and New-Tec Industrial Company, all with an address at No. 25-1 Ta Yeh South Road, Hsaio Kang District, Kaohsiung City, Taiwan ROC 91219, LTD., states as follows:

## NATURE OF THE CASE

1.  This is a civil action for: (i) contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and N.J.S.A. 56:9-3; (ii) monopolization, attempted monopolization and conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and N.J.S.A. 56:9-4; (iii) tortious interference with contractual relationships and prospective economic advantage in violation of New Jersey State law; and (iv) violation of the covenant of good faith and fair dealing as applied by New Jersey State law.

## The Parties

2.  Coast To Coast Entertainment, LLC ("C2C") is a New Jersey limited liability company with an address at 4000 Bordentown Avenue, Sayreville, Middlesex County, New Jersey. C2C has been involved in the sale of amusement/arcade skill cranes since in or about 1999. A skill crane is a skill-based game which challenges a player to maneuver a crane with a claw-type device by utilizing controls in order to retrieve a desired prize from an enclosed cabinet area (hereafter, "Crane"). Typically, the prizes consist of plush toys and more recently candy.

3.  Defendant Coastal Amusements, Inc. ("Coastal") has a business address at 1935 Swarthmore Avenue, Lakewood, New Jersey. Defendant Coastal is engaged in the sale of amusement/arcade games, including Cranes. Upon information and belief, Coastal has in excess of twenty years of experience in the amusement business.   Upon information and belief, Lenny Dean and Sal Mirando are the principal officers of Coastal.

4.  Defendants Wu Mar Harng Enterprise, Ltd. ("Wu Mar"), and Paokai Enterprise Co., Ltd. ("Paokai"), are both entities which are located in Taiwan, with an address at No. 25-1 Ta Yeh South Road, Hsaio Kang District, Kaohsiung City, Taiwan ROC 91219. Wu Mar and Paokai are involved in the development,

manufacturing, and/or sale of amusement/arcade games, including Cranes. Upon information and belief, Paokai is the parent company of Wu Mar.

5.  Upon information and belief, defendants Wu Mar, Inc. and New-Tec Industrial Company ("New Tec") are entities owned, affiliated and/or operated by Wu Mar and/or Paokai. Wu Mar, Inc. and New Tec have the same business address as Wu Mar. Wu Mar, Inc. and New Tec are both involved in the development, manufacturing and/or sale of amusement/arcade games, including Cranes (hereafter, Wu Mar, Paokai, Wu Mar, Inc. and New Tec are collectively referred to as the "Wu Mar Defendants"). Upon information and belief, Mr. Ming Shan Wei ("Mr. Wei") is the owner of the Wu Mar Defendants.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1337(a) and 1367 because the Complaint includes claims arising under federal law, including the Sherman Act. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.  Venue is appropriate in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b), because defendant Coastal resides and may be found there by virtue of transacting business there and, pursuant to 28 U.S.C. § 1391(c), by

virtue of this Court having personal jurisdiction over defendants.  In addition, venue is appropriate in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District.

### FACTS GIVING RISE TO THE COMPLAINT

**A.    The Crane Industry**

8.  In 2003, there were approximately 112,000 "Prize Dispensing Games," which category includes Cranes, on location in the United States.

9.    Of those 112,000 games, approximately 90% were Cranes. Thus, there were approximately 100,800 Cranes on location in the United States in the year 2003.

10.  In 2004, there were approximately 108,000 Cranes on location in the United States and it is expected that approximately 15,930 new Cranes will be sold in the United States during 2005.

11.  There are three avenues by which a company can participate in what is known as the manufacturing side of the Crane industry in the United States:  1) the company can manufacture from scratch and sell their own cranes; 2) the company can import cranes from a foreign manufacturer; or 3) the company can

import component parts from a foreign manufacturer and assemble the Crane in the United States using the imported parts.

12.   The manufacturing side of the Crane industry in the United States is essentially made up of eight companies, each of whom participates through one of the aforementioned avenues.  These eight Crane companies include the following:

1.  Smart Industries, 1626 Delaware Ave., Des Moines, Iowa;
2.  Rainbow Crane, Inc., 1181 Gulf to Lake Highway, Lecanto, Florida;
3.  Skee-Ball, Inc., 121 Liberty Lane, Chalfont, PA
4.  Innovative Concepts in Entertainment, Inc. ("ICE"), 10123 Main Street, Clarence, PA;
5.  United Textiles Fabricators, Toms River, New Jersey;
6.  Benchmark Games, Inc., 51 Hypoluxo Road, Hypoluxo, Florida;
7.  Defendant, Coastal; and
8.  Plaintiff, C2C.

13.   Of the eight companies listed above Smart Industries[1], Rainbow Cranes, ICE, and Benchmark all manufacture their own Cranes for sale in the United States.  Skee-Ball imports its Cranes from a manufacturer in Belgium and United Textile manufactures its own cabinets and imports component "kits" from Asia to be assembled and installed in its Cranes.

---

[1] Smart Industries has recently began to manufacture a line of cheaper Cranes in Asia for importation into the United States.

14.  Of the three methods of obtaining/manufacturing Cranes, importing

Cranes from Asia is the most cost effective; however, excepting the Wu Mar

Defendants, Asian manufacturers do not produce high quality products.

15.  The manufacturing and import cost of a typical Wu Mar Crane (i.e.,

model #188 – 31" Crane) purchased by C2C was $1,000.00 per Crane.  C2C

generally sells this Crane at a price ranging from $1,300 (to distributors) up to

$1,795.00 (to end-users).  Coastal, which sells only Cranes manufactured by Wu

Mar, sells the similar 31" Crane to its distributors at a price of approximately

$1,595.00.

16.  Upon information and belief, the prices for Cranes sold in the United

States market by the remaining companies are as follows:

> Smart Industries sells two lines of Cranes – a line
> manufactured by Smart and a line imported by Smart.
> A Crane manufactured by Smart Industries in the
> United States, which is comparable to Wu Mar's 31"
> Crane, typically sells at a price ranging from $2,497 to
> $2,795.00.  Smart Industries also sells a line of imported
> Cranes.  Smart Industries' imported Cranes are not of
> comparable quality to those manufactured by Wu Mar.
> The price for Smart Industries' imported Crane which is
> of similar size ranges from $1,295.00 to $1,595.00.
>
> Rainbow Cranes only sells Cranes which it
> manufactures in the United States.  The Rainbow Crane,

comparable to Wu Mar's 31" Crane, typically sells at a price ranging from $2,795.00 to $2,995.00.

Skee-Ball sells Cranes which it imports from a manufacturer in Belgium. The Skee-Ball Crane, comparable to Wu Mar's 31" Crane, typically sells at a price range of approximately $3,295.00. This Belgium manufacturer sells its Cranes in the United States exclusively through Skee-Ball.

ICE sells Cranes which it manufactures in the United States. ICE also imported a 31" Crane for sale in the United States. However, ICE has discontinued importing this Crane as a result of its inferior quality. ICE's Crane, comparable to Wu Mar's 31" Crane, typically sells at a price ranging from $2,795.00 to $3,295.00.

Benchmark only sells Cranes which it manufactures in the United States. The Benchmark Crane, comparable to Wu Mar's 31" Crane, typically sells at a price of approximately $2,995.00.

United Textile, which manufactures its cabinets, but imports its components, sells a Crane of similar size to Wu Mar's 31" Crane, at a price of $1,495.00. However, due to the process by which these Cranes are manufactured they are of inferior quality as compared to Wu Mar Cranes.

17. There is no Crane in the industry that is comparable to the Wu Mar Defendants' Crane in terms of quality and price.

**B.**     **Coast To Coast's entry into the Crane industry**

18.  C2C entered the Crane industry in 1999 by establishing a relationship with the Wu Mar Defendants.  At first, C2C purchased Cranes that were manufactured by Wu Mar without substantial modification.  C2C would then sell those Cranes mainly to end users.

19.  As C2C became more knowledgeable about the industry and the U.S. market, it began to direct the Wu Mar defendants as to how to manufacture the Cranes it wanted to purchase.  Specifically, the modifications requested by C2C included, but were not limited to:  software changes, graphic changes, names, logos, lighting, physical characteristics, safety enhancements, security enhancements, and overall changes to the Cranes appearance to make the Cranes more appealing to the United States market.

20.  Prior to C2C's involvement with the Wu Mar defendants very few Cranes manufactured in Asia were being used in the U.S. market.  Most, if not all, of the Cranes in the U.S. market were manufactured in the U.S. or in Europe.

21.  C2C determined that the Wu Mar Cranes were of a superior quality to those being used in the U.S.  Moreover, the Wu Mar Cranes could be manufactured, imported and marketed at prices below the existing Cranes in the

U.S. market.  C2C also recognized that it could sell Wu Mar's Cranes to U.S. distributors as well as end users.

22.  Indeed, between the modifications made by C2C and the end users' success with Wu Mar Cranes, C2C's Crane business has grown rapidly over the past 6 years.  C2C sold: 13 Cranes in 2000; 75 Cranes in 2001; 265 Cranes in 2002; 523 Cranes in 2003; 485 Cranes in 2004; and 792 Cranes to date in 2005. If Coastal and Wu Mar had not conspired to cut off C2C's supply of Wu Mar Cranes, C2C likely would have sold at least 1,400 Cranes by the year's end.

## C.    Coastal's entry into the Wu Mar Crane market.

23.  As C2C was beginning the process of selling Wu Mar Cranes in the U.S., Lenny Dean, an officer of Coastal, informed C2C that the selling price of C2C's Cranes was "much too cheap."  In fact, having known the principals of Coastal for many years, Gary Balaban, of C2C, had numerous conversations with Coastal about the Wu Mar Cranes.

24.  Coastal was very interested in learning the particulars of the Cranes C2C was purchasing from Wu Mar.  Based on certain relationships that existed at the time, C2C disclosed the particulars about the Wu Mar Cranes, including pricing information, manufacturing information, the exceptional customer service offered

by the Wu Mar Defendants and the Wu Mar Defendants' willingness to accept and incorporate C2C's modifications to the Cranes.

25.  In or about 2001, Coastal began to purchase Wu Mar Cranes for sale in the United States.  Coastal primarily sells its products, including Cranes, through distributors.  While, Coastal is a well established amusement/arcade machine manufacturer and supplier, prior to initiating its relationship with Wu Mar, Coastal had not sold any Cranes for at least 20 years.

26.  At some point early in the relationship between Coastal and the Wu Mar Defendants, Coastal and the Wu Mar Defendants allegedly entered into an agreement which prohibited the Wu Mar Defendants from selling Cranes to other entities, except for the sale of a certain Crane, model #188, to C2C.

**D.    Coastal exerts pressure on the Wu Mar Defendants resulting in unreasonable restraints on trade, including vertical price fixing.**

27.  Coastal's relationship with the Wu Mar Defendants had an immediate and substantial negative impact on C2C's relationship with the Wu Mar Defendants. This was due primarily to Coastal's market power and resulting influence.

28.  Coastal, a much larger company, began to purchase substantially more Cranes than C2C.  Ultimately, Coastal wielded its market power and influence in

order to dictate the terms of the relationship between the Wu Mar Defendants and C2C.

29. Moreover, Coastal sought to control C2C's ability to be competitive in the Wu Mar Crane market as to volume, price, product and method of sale. Indeed, Coastal, through the Wu Mar Defendants, sought to ensure that C2C did not sell Cranes below Coastal's prices.

30. From the beginning and up until the fall of 2004, C2C marketed its Cranes by advertising in trade journals, exhibiting at trade shows, and via the internet.

31. The majority of the Cranes sold by C2C are sold directly to end-users as opposed to through distributors. However, over time, through participation in the market, C2C began to sell Cranes to a few amusement game distributors.

32. With the prospect of competition in the Wu Mar Crane market from C2C looming, Coastal began its efforts to monopolize the market.

33. Throughout the last several years, Coastal, through and with the Wu Mar Defendants, sought to control C2C's pricing and marketing of the Wu Mar Cranes. Wu Mar, at the behest of Coastal, has repeatedly insisted that C2C not sell its Cranes: (a) below the price which Coastal sells its Wu Mar Cranes to its

distributors in the United States, and (b) not to market or sell its Cranes directly to Coastal's distributors.

34.   Further, the Wu Mar Defendants have directed C2C to revise its prices and to remove pricing information from C2C's advertisements in trade publications.  The Wu Mar Defendants stated openly that these directives were made at the demand of Coastal.

35.   In each of the instances outlined above, the Wu Mar Defendants enforced these demands by threatening to cut off production of C2C's Cranes in the event of non-compliance.  Faced with such pressure, C2C often gave in to many of Coastal's demands made through the Wu Mar Defendants.

36.   As a means to increase sales, in the fall of 2004, C2C hired a salesperson to begin marketing Cranes for sale to distributors.  Within a matter of days, Wu Mar began threatening C2C that it would stop manufacturing Cranes for C2C if it did not change this course of action.

37.   Again, the Wu Mar Defendants were acting in concert with, and at the direction of, Coastal.  In fact, on September 22, 2004, the Wu Mar Defendants sent to C2C an e-mail stating that they "heard that you [C2C] are hiring a salesman and he is doing quite a good job for you. . . . . We think it is not a good

strategy to sell your cranes because your are directly competing against our distributor which will also hurt our sales and relationship with Coastal. . . . Please try to explain your new sales strategy. What's your distribution price now?"

38.  The collusive conduct did not cease. On September 23, 2004, the Wu Mar Defendants advised C2C that it had to refrain from selling to any distributors of Coastal and, further, to remove its prices from its advertisement. Specifically, Wu Mar stated as follows:

> I wish you not to "touch" any of the distributors of Coastal concerning to cranes (any of your types). Please have your salesman to understand. You may offer them products that Coastal doesn't offer, but never give them any quotation or try to get cranes orders from them. Of course there are many distributors very loyal to Coastal, but if you offer them a price lower than Coastal can offer, they have doubt on Coastal and may cause conflicts between them. It also would be good if you can remove your distribution price from the ad.
>
> If you can not promise the above, I will be forced to make a decision to have one sole distributor in the US…
>
> …you have started to offer our crane much before than Coastal. But we have to tell you that Coastal is buying much much more cranes than you. Even under this condition, we have always tried to protect your company and cooperate with you in all the modifications or development or requests; even under the pressure from Coastal's complains (we don't tell

> you much about this, but we did many many times
> trying to convince and promise that Coast to Coast will
> not hurt their sales).

39. Ultimately, C2C was left with no choice but to succumb to the pressure exerted by the Wu Mar Defendants on behalf of Coastal.

40. On October 6, 2004, the principals of C2C met with Mr. Wei and his assistant, Rita Lai, at a trade show in Las Vegas, Nevada. During that meeting C2C advised the Wu Mar Defendants that it was inappropriate for the Wu Mar Defendants to dictate the price at which, and to whom C2C may sell its Cranes.

41. C2C reminded Mr. Wei of the fact that C2C had introduced the Wu Mar Defendants' Cranes in the U. S. market and that C2C had worked very hard to generate the confidence in and access to the U.S. market for a Crane imported from Asia.

42. In order to preserve its place in the Wu Mar Crane market, C2C acquiesced to the Wu Mar Defendants' demand that it stop selling Cranes to Coastal's distributors. At this meeting, C2C gave the Wu Mar Defendants a list of distributors to whom C2C had been selling its Cranes, which the Wu Mar Defendants, without obtaining the consent of C2C, then provided to Coastal.

43. Despite C2C's acquiescence regarding Coastal's unreasonable demands to restrain trade, Coastal continued to complain to the Wu Mar Defendants about C2C's involvement in the Wu Mar Crane market.

44. On December 7, 2004, after receiving another complaint from Coastal, the Wu Mar Defendants sent an e-mail to C2C, which expressly sought to restrict not only who C2C could sell to, but also the price at which C2C could sell. The e-mail stated in pertinent part:

> As I mentioned before, when I gave Lenny and Sal [Coastal's owners] the list of distributors received at IAAPA from you, they told me that Mountain Coin and Discount Arcade are their customers so they told me that you can not sell cranes to them. They also told us that you can not either offer to Bay Coin and East Coast Amusements because they are known distributors (resellers) that compete directly with their distributor. We must agree with Coastal on this because if you are offering your cranes to them, you are competing against Wu Mar's cranes which is not good for us.

> We repeat again that Coastal accept that Coast to Coast sell only to retail operators but never to re-sellers. Please also hold your retail price to a competitive level to not disturb the market pricing and create confusion.

> Please try to understand the situation. Mr. Wei and I understand that we are limiting your business in cranes but if you agree to cooperate with us and follow the

rules, we will always help you for new products and releases in the future.

45.  In a further effort to control pricing in the market, on December 9, 2004, the Wu Mar Defendants sent an "Important Notice" to its customers.  At the time this "Important Notice" was sent, upon information and belief, C2C and Coastal were the only two (2) customers of the Wu Mar Defendants selling Cranes in the United States.  The Important Notice provided, in relevant part:

> In order to maintain the pricing stability in the market, we understand how important it is to keep prices the more competitive possible.  But we can not disregard either the importance of manufacturing reliable products and developing great games for you.  In order to reflect the above 2 factors [increase in cost of raw materials and devaluation of the United States dollar], we estimate to make an adjustment to our current selling rates since January 2005.  The average raise will be around 5%-10%.  Please adjust your distribution selling rates now accordingly.  We need your help and support so we can grow all together and create the most profitable market ever.

46.  On December 10, 2004, C2C objected to the Wu Mar Defendants' attempt to fix prices, as well as the other restraints Coastal sought to impose upon C2C through the Wu Mar Defendants.

47.  On or about January 4, 2005, C2C received two e-mails from the Wu Mar Defendants.  In the first e-mail, the Wu Mar Defendants forwarded to C2C a

complaint made by Coastal regarding C2C's pricing and indicated their disappointment in C2C's conduct regarding pricing.  In the second e-mail, the Wu Mar Defendants outlined the terms of an alleged agreement between the Wu Mar Defendants and Coastal regarding the sale of the Wu Mar Defendants' Cranes in the United States.

48.  After reiterating some of the previous restraints placed on C2C's ability to participate in the Wu Mar Crane market, the Wu Mar Defendants threatened to terminate their relationship with C2C and eliminate C2C from the Wu Mar Crane market if they did not comply with the demands made by the Wu Mar Defendants at the behest of Coastal.

49.  On or about January 13, 2005, the Wu Mar Defendants sent an e-mail to C2C quoting an e-mail from Coastal to Wu Mar which stated:  "we must protect our reputation, and I will continue to demand that you hold Coast to Coast to the original agreement or stop selling to them."

50.  In an attempt to placate Coastal, C2C offered to permit Coastal to purchase a C2C proprietary specification Crane known as the "Double Play" Crane, through C2C, at an agreed upon mark-up price to be paid by Coastal to C2C.  The Wu Mar Defendants subverted this offer by instead selling C2C's

proprietary Double Play Cranes directly to Coastal without proceeding through C2C or paying any mark-up price to C2C.

51. In an e-mail dated March 29, 2005, the Wu Mar Defendants informed C2C that they would no longer manufacture Cranes for C2C. In the e-mail, the Wu Mar Defendants state the following:

> I have to inform you that we have decided to make a very important decision regarding the distribution in the USA. We know that you will be hurt, angry, mad. . . We had to choose just one distributor for our cranes in the United States at this point . . .
>
> The cranes sole distributorship agreement that we will sign with Coastal will start to be valid April 1st 2005. . .

52. The Wu Mar Defendants also agreed to accept Crane orders from C2C up until April 1, 2005. The final orders from C2C were to be shipped by May 31, 2005.

53. The March 29, 2005 termination notice sent by Wu Mar gave C2C only two days to place any additional Crane orders. Faced with this commercially unreasonable deadline, C2C ordered seven additional containers of Cranes.

54. The Wu Mar Defendants only acknowledged five of the seven container orders and refused to manufacture the two additional containers of Cranes ordered by C2C.

55. By letter dated May 5, 2005, C2C, through counsel, advised Coastal that C2C considered Coastal's conduct to be in direct violation of United States Anti-Trust Laws, New Jersey State Anti-Trust Laws, and New Jersey Common law.

56. At the time the letter was sent, the principals of Coastal and C2C met in an effort to resolve the issues that had developed. While C2C's ultimate goal was to continue to be involved in the Wu Mar Crane market, a merger of the companies and/or acquisition of C2C by Coastal were both discussed. It was agreed between Coastal and C2C that pending further negotiations, that C2C could purchase Wu Mar Cranes through Coastal at a $100 mark-up per Crane.

57. In furtherance of said interim agreement, C2C placed orders for additional Cranes through the Wu Mar Defendants. On June 14, 2005, C2C received e-mail from the Wu Mar Defendants acknowledging orders by C2C of additional Cranes. However, the Wu Mar Defendants responded that it had issued pro-forma invoices to Coastal for these purchases, but had not yet heard back from Coastal.

58. On June 17, 2005, Coastal sent an e-mail to C2C stating the following:

> Coastal Amusements has made a decision not to accept any purchase orders for cranes from Coast to Coast. Coast to Coast remains free to purchase Wu Mar/Paokai manufactured cranes from our distributors or to purchase cranes made by other manufacturers.
>
> Also be advised that Coastal Amusements is not interested in exploring the prospect of a merger with or the acquisition of Coast to Coast.

59. On June 20, 2005, C2C advised the Wu Mar Defendants that Coastal would not accept any purchase orders from C2C. Subsequent to the placement of its final Crane order with the Wu Mar Defendants on April 1, 2005 – only a portion of which was honored, C2C has been unable to purchase any further Wu Mar Cranes.

60. Coastal has continued to interfere with C2C's business and business opportunities.

61. On July 22, 2005, C2C attended a trade show in Chicago, Illinois, primarily targeted for distributors in the amusement/arcade machine industry. The American Amusement Machine Association ("AAMA") is the organization that sponsored this trade show. C2C has been a member of AAMA since 1999.

62. When C2C's representative arrived at the trade show, one day early, he was informed that he could set up C2C's display booth. C2C's representative

selected a booth directly in front of the main door to the exhibit area in order to provide maximum exposure for C2C's products.

63.   When C2C's representative returned to the trade show he found that C2C's products had been moved to a less visible location.  C2C's representative was told by the AAMA that Sal Mirando, a representative of Coastal and an officer of AAMA, had a "problem" with C2C and its products being there.  In fact, Coastal was given C2C's original location on the trade show floor.

64.   Moreover, Sal Mirando demanded that C2C be removed from the show completely.  He claimed C2C was not properly in attendance and that C2C should not be permitted to exhibit Cranes which are the same as Coastal's Cranes manufactured by the Wu Mar Defendants.

65.   C2C's representative was told that C2C had failed to pay the appropriate fees in order to participate in the show.  While C2C disputed the fact that it failed to pay the appropriate fees, it paid a fee to the AAMA so that it could participate.

66.   C2C has attempted to find an alternative to the Wu Mar Crane; however, no viable alternative currently exists.

67.   C2C has investigated manufacturing its own Cranes in the United States, but the cost to manufacture comparable Cranes in the United States was estimated

## COUNT I
## CONTRACT, COMBINATION OR CONSPIRACY
## IN VIOLATION OF SECTION 1 OF THE
## SHERMAN ACT

70.  Plaintiff incorporates by reference, restates and realleges the allegations contained in Paragraphs 1 though 69 above as if fully restated herein.

71.  Defendants have engaged in a *per se* unlawful contract, combination or conspiracy, seeking to control, set and fix the resale prices at which Wu Mar Cranes can be resold by Wu Mar distributors, such as C2C.

72.  In the alternative, to the extent Defendants' conduct is found not to be a *per se* violation, Defendants have engaged in conduct that is unlawful under a rule of reason analysis in that the anticompetitive effects of the restraints imposed by the contract, combination or conspiracy between the Defendants far outweighs the pro-competitive justifications for the restraints.

73.  In furtherance, and to enforce such illegal contract combination and conspiracy, the Wu Mar Defendants, at the insistence and behest of Coastal, has taken coercive and retaliatory actions against Plaintiff, including terminating Plaintiffs as a Wu Mar Crane distributor.

74.  As a result of the defendants illegal contract, combination and conspiracy Plaintiff stands to suffer and/or has already suffered irreparable injury.

Wherefore, Plaintiffs demand judgment against defendants:

#2639461 (144410.001)                                            24

(a) Granting plaintiff preliminary and permanent injunctive relief against the Wu Mar Defendants and Coastal, plus its reasonable attorney's fees and costs, pursuant to 15 U.S.C. §§ 15 and 26;

(b) Awarding plaintiff treble the damages sustained to their business as a result of defendants' antitrust violations, plus prejudgment interest, and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 15; and

(c) Such other relief as the Court deems just and proper.

## COUNT II

### CONTRACT, COMBINATION OR CONSPIRACY IN VIOLATION OF N.J.S.A. 56:9-3

75. Plaintiff incorporates by reference, restates and realleges the allegations contained in Paragraphs 1 though 74 above as if fully restated herein.

76. Defendants have engaged in a *per se* unlawful contract, combination or conspiracy, seeking to control, set and fix the resale prices at which Wu Mar Cranes can be resold by Wu Mar distributors, such as C2C.

77. In the alternative, to the extent Defendants' conduct is found not to be a *per se* violation, Defendants have engaged in conduct that is unlawful under a rule of reason analysis in that the anticompetitive effects of the restraints imposed by the contract, combination or conspiracy between the Defendants far outweighs the pro-competitive justifications for the restraints.

#2639461 (144410.001)

25

78.  In furtherance, and to enforce such illegal contract combination and conspiracy, the Wu Mar Defendants, at the insistence and behest of Coastal, has taken coercive and retaliatory actions against Plaintiff, including terminating Plaintiffs as a Wu Mar Crane distributor.

79.  As a result of the defendants illegal contract, combination and conspiracy Plaintiff stands to suffer and/or has already suffered irreparable injury.

Wherefore, Plaintiffs demand judgment against defendants:

(a) Granting plaintiff preliminary and permanent injunctive relief against the Wu Mar Defendants and Coastal, plus its reasonable attorney's fees and costs, pursuant to N.J.S.A. 56:9-10;

(b) Awarding plaintiff treble the damages sustained to their business as a result of defendants' antitrust violations, plus prejudgment interest, and reasonable attorney's fees and costs pursuant to N.J.S.A. 56:9-12; and

(c) Such other relief as the Court deems just and proper.

## COUNT III

## UNLAWFUL MONOPOLIZATION, ATTEMPTED MONOPOLIZATION AND CONSPIRCY TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

80.  Plaintiff incorporates by reference, restates and realleges the allegations contained in Paragraphs 1 though 79 above as if fully restated herein.

81.  The manufacture of high-quality, low cost Cranes out of Asia to be sold in the United States is a distinct line of trade and commerce.

82.  More specifically the unique production process of Wu Mar Cranes, distinct prices, and specialized vendors make Wu Mar Cranes a separate economic entity, which is evidenced by the lack of elasticity of demand associated with Wu Mar Cranes.

83.  As set forth above, Coastal, with the cooperation of the Wu Mar Defendants, has gained monopoly power, or has come dangerously close to acquiring monopoly power, in the Wu Mar Crane market.

84.  Moreover, Coastal has exerted its monopoly power in order to maintain its monopoly status.

85.  As a result of the conduct and violations set forth above, Coastal, with the cooperation of the Wu Mar Defendants, has monopolized, attempted to monopolize and/or engaged in a conspiracy to monopolize the Wu Mar Crane market.

86.  Plaintiff has been injured as a result of the defendants' conduct and violations of Federal and State antitrust laws.

Wherefore, plaintiff demands judgment against defendants:

#2639461 (144410.001)                              27

(a) Granting Plaintiff preliminary and permanent injunctive relief against the Wu Mar Defendants and Coastal, plus its reasonable attorney's fees and costs, pursuant to 15 U.S.C. §26;

(b) Awarding plaintiff treble the damages sustained to their business as a result of defendants' antitrust violations, plus prejudgment interest, and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 15; and

(c) Such other relief as the Court deems just and proper.

## COUNT IV

### UNLAWFUL MONOPOLIZATION, ATTEMPTED MONOPOLIZATION AND CONSPIRCY TO MONOPOLIZE IN VIOLATION OF N.J.S.A. 56:9-4

87. Plaintiff incorporates by reference, restates and realleges the allegations contained in Paragraphs 1 though 86 above as if fully restated herein.

88. The manufacture of high-quality, low cost Cranes out of Asia to be sold in the United States is a distinct line of trade and commerce.

89. More specifically the unique production process of Wu Mar Cranes, distinct prices, and specialized vendors make Wu Mar Cranes a separate economic entity, which is evidenced by the lack of elasticity of demand associated with Wu Mar Cranes.

## COUNT V

### DEFENDANTS' TORTIOUS INTERFERENCE
### WITH PLAINTIFF'S PROSPECTIVE
### ECONOMIC ADVANTAGES

94.  Plaintiff incorporates by reference, restates and realleges the allegations contained in Paragraphs 1 though 93 above as if fully restated herein.

95.  Plaintiff has been a faithful Wu Mar Crane distributor for over five years.

96.  In fact, Plaintiff introduced Wu Mar Cranes into the United States market and spent years developing the Cranes and the United States customers' confidence in the Wu Mar Cranes.

97.  Plaintiff also participated in the design and manufacturing of the Wu Mar Cranes so that the Wu Mar Cranes would be ideal for the United States customers.

98.  The number of Wu Mar Cranes Plaintiff has sold has steadily increased each year.  In fact, Plaintiff hired a salesman in order to pursue more Wu Mar Crane sales.

99.  Plaintiff was clearly in pursuit of the business of selling Wu Mar Cranes and reasonably expected to gain an economic advantage thereby.

100.      As stated above and demonstrated by the e-mails by and between the defendants and Plaintiff, Coastal and the Wu Mar Defendants engaged in

intentional and malicious conduct that interfered with Plaintiff's expected economic advantage.

101.    As a result of defendants' interference Plaintiff lost its prospective economic advantage and has suffered damages.

Wherefore, plaintiff demands judgment against defendants:

(a) Granting Plaintiff preliminary and permanent injunctive relief against the Wu Mar Defendants and Coastal, plus reasonable attorney's fees and costs;

(b) Awarding plaintiff the damages sustained to their business as a result of defendants' tortious interference, plus prejudgment interest, and reasonable attorney's fees and costs; and

(c) Such other relief as the Court deems just and proper.

## COUNT VI

### DEFENDANT COASTAL'S TORTIOUS INTERFERENCE WITH PLAINTIFF'S CONTRACT

102.    Plaintiff incorporates by reference, restates and realleges the allegations contained in Paragraphs 1 though 101 above as if fully restated herein.

103.    Plaintiff had a contractual relationship with the Wu Mar Defendants, whereby the Wu Mar Defendants would fulfill Plaintiff's purchase orders for Wu Mar Cranes as the orders were received.

104.    As a direct result of Coastal's interference, as described above, the Wu Mar Defendants terminated their relationship with Plaintiff.

105.    Coastal's interference was intentional and malicious.

106.    As a result of Coastal's interference, Plaintiff has suffered damages.

Wherefore, plaintiff demands judgment against defendants:

(a) Granting Plaintiff preliminary and permanent injunctive relief against the Wu Mar Defendants and Coastal, and reasonable attorney's fees and costs;

(b) Awarding plaintiff the damages sustained to their business as a result of defendants' tortious interference, plus prejudgment interest, and reasonable attorney's fees and costs; and

(c) Such other relief as the Court deems just and proper.

## COUNT VII

### THE WU MAR DEFENDANTS' BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

107.    Plaintiff incorporates by reference, restates and realleges the allegations contained in Paragraphs 1 though 106 above as if fully restated herein.

108.    New Jersey common law implies a duty of good faith and fair dealing in every contractual relationship.

109.    As such there was implied in the relationship between the Wu Mar Defendants and Plaintiff a duty of good faith and fair dealing.

110.    The Wu Mar Defendants breached that duty by terminating their relationship with Plaintiff without first providing adequate notice to Plaintiff.

111.    As a result of said breach Plaintiff has suffered damages.

Wherefore, plaintiff demands judgment against defendants:

(a) Granting Plaintiff preliminary and permanent injunctive relief against the Wu Mar Defendants and Coastal, plus its reasonable attorney's fees and costs;

(b) Awarding plaintiff the damages sustained to their business as a result of defendants' tortious interference, plus prejudgment interest, and reasonable attorney's fees and costs; and

(c) Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  August 8, 2005        WILENTZ, GOLDMAN & SPITZER P.A.
                                 90 Woodbridge Center Drive
                                 Post Office Box 10
                                 Woodbridge, New Jersey  07095
                                 (732) 636-8000

BY: _____
        DONALD E. TAYLOR (DT 8249)

- and -

SMITH, SMITH & CURLEY, P.C.
149 Avenue at the Common
Shrewsbury, New Jersey 07702
(732) 935-7246

BY: _____
        ROBERT SMITH (RS 3234)
Attorneys for Plaintiff
Coast to Coast Entertainment, LLC

#2639461 (144410.001)                 34

## **VERIFICATION**

Gary Balaban, being of full age, hereby certifies:

1.    I am one of the owners of Plaintiff, Coast To Coast Entertainment, LLC.

2.    Based on my personal knowledge and review of relevant documents, the foregoing allegations are true, correct and accurate.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

DATED:  August 8, 2005

_____
                        Gary Balaban