<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| COAST TO COAST ENTERTAINMENT, LLC, | : | |
| | : | CIVIL ACTION NO: 05-3977 (MLC) |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| COASTAL AMUSEMENTS, INC., WU MAR HARNG ENTERPRISE, LTD., WU MAR, INC., PAOKAI ELECTRONIC ENTERPRISE CO., LTD., and NEW-TEC INDUSTRIAL COMPANY, | : | |
| Defendants. | : | |

<u>**COOPER, District Judge**</u>

Plaintiff, Coast to Coast Entertainment, LLC ("C2C"), moves, pursuant to Federal Rule of Civil Procedure ("Rule") 65, to preliminarily enjoin: (1) the termination of the contractual relationship between C2C and Wu Mar Harng Enterprise, Ltd., Wu Mar, Inc., Paokai Electronic Enterprise Co., Ltd., and New-Tec Industrial Company (collectively referred to as "Wu Mar"), (2) Wu Mar from failing and refusing to provide C2C with Wu Mar amusement cranes, consistent with orders placed by C2C, (3) defendant Coastal Amusements, Inc. ("Coastal") and Wu Mar from setting or controlling the prices at which C2C may sell Wu Mar cranes, and (4) the defendants from controlling the customers to whom C2C may sell Wu Mar cranes. (C2C's Prop. Ord.)

C2C brought this action on August 9, 2005. (Dkt. entry no. 1). C2C alleges that (1) the defendants conspired to fix the

minimum resale price levels and restrain trade in the Wu Mar crane market, (2) on June 17, 2005, Wu Mar informed C2C that it would no longer accept purchase orders for amusement cranes from C2C, and (3) Wu Mar's refusal to accept C2C's purchase orders stems from C2C's refusal to fix its resale prices at the minimum price level set by Coastal. (C2C's Br., at 1-2; Balaban Decl., at ¶ 50 & Ex. P.) Therefore, C2C claims that (1) Coastal has established a monopoly over the Wu Mar crane market and (2) the defendants have established a price-fixing scheme violating federal and state antitrust laws. (C2C's Br., at 2.) The complaint specifically asserts causes of actions for (1) violations of sections 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), (2) violations of sections 56:9-3 and 56:9-4 of the New Jersey Antitrust Act ("NJAA"), (3) tortious interference with prospective economic advantage, (4) tortious interference with contract (against Coastal), and (5) breach of the duty of good faith and fair dealing (against Wu Mar). (Compl.)

The Court has considered the papers submitted by the parties and heard oral argument on October 5, 2005. The Court now issues its findings of fact and conclusions of law as required by Rule 52. The Court, for the reasons stated herein, will deny C2C's motion.

## CHRONOLOGY OF EVENTS - FACTUAL FINDINGS

### I.   The Amusement Crane Industry

Most of the facts are undisputed. This matter concerns amusement skill cranes ("cranes"). A crane is "a skill-based game

which challenges a player to use a claw-type device by utilizing controls in order to retrieve a desired prize from an enclosed cabinet area.  The prizes consist of plush toys and, more recently, candy." (C2C's Br., at 2; see also Balaban Decl., at ¶ 2; Mirando Decl., at ¶ 4; Wei Decl., at ¶ 5.)  There were approximately 108,000 cranes on location in the United States in 2004, and it is estimated that an additional 16,000 new cranes will be sold in the United States in 2005.  (Balaban Decl., at ¶ 11.)[1]

The three ways in which a company can participate in the "manufacturing side" of the crane industry in the United States are: (1) manufacture and sell its own cranes, (2) import cranes from a foreign manufacturer, or (3) import component parts from a foreign manufacturer and assemble the crane in the United States. (Id. at ¶ 15.)  The manufacturing side of the crane industry in the United States is essentially made up of eight companies, including Coastal and C2C.  (Id. at ¶ 7; Mirando Decl., at ¶ 46.)

---

[1]  Coastal disputes Balaban's assertion concerning the overall number of cranes sold in the United States.  (Mirando Decl., at ¶¶ 58-59.)  Specifically, Coastal contends that C2C has presented two irreconcilable statements concerning the number of cranes sold in the United States.  (Id.)  On the one hand, C2C states that Play Meter 2004 indicates that there are 41,000 cranes on location in the United States.  (Balaban Decl., at ¶ 8.)  On the other hand, C2C states that another industry publication, Vending Times, indicates that 108,000 cranes were on location in the United States in 2004.  (Id. at ¶¶ 9, 10.)  As Coastal points out, there is a large discrepancy between these two numbers; however, for purposes of determining the merits of C2C's contentions here, the Court will use the number of cranes proposed by C2C.

## II.   <u>C2C's Involvement with Wu Mar Cranes</u>

C2C is a New Jersey company engaged in the sale of amusement and arcade games, and has been involved in the sale of cranes since approximately 1999. (Balaban Decl., at ¶¶ 2, 3.)  When C2C started selling cranes, C2C purchased cranes manufactured by Wu Mar.  (<u>Id.</u> at ¶ 21; Wei Decl., at ¶ 11.)  Wu Mar and C2C did not have a written contract for the supply or distribution of Wu Mar cranes.  (Wei Decl., at ¶ 12.)

Wu Mar is located in Taiwan and "develops the concepts, artwork, mechanical parts, software and hardware for recreation machines [including cranes]." (<u>Id.</u> at ¶ 4.)  Wu Mar manufactures more than twenty different model cranes.  (<u>Id.</u>)  Wu Mar is one of approximately twelve crane manufacturers in Taiwan and China. (<u>Id.</u> at ¶ 8; Mirando Decl., at ¶ 47.)

C2C initially sold the cranes to mainly end users and did not request any modifications to the cranes.  (Balaban Decl., at ¶ 21.)  Eventually, C2C asked that Wu Mar modify its cranes that C2C wanted to purchase by requesting, <u>inter alia</u>, software changes, graphic changes, modifications to the physical characteristics of the crane, safety enhancements, and security enhancements.  (<u>Id.</u>)  C2C would pay approximately $1,000 per Wu Mar crane.[2]  (<u>Id.</u> at ¶ 17.)  C2C then sells the cranes at a "price

_____

[2] C2C referenced this amount to its purchase of Wu Mar's model #188-31" crane.  (C2C's Br., at 5.)

4

ranging from $1,300 (to distributors) up to $1,795 (to end-users)." (C2C's Br., at 5.)  C2C's business has grown during its six years of selling cranes, and as of August 9, 2005, C2C had sold 792 amusement cranes in 2005.[3] (Balaban Decl., at ¶ 24.)

From its inception and until the fall of 2004, C2C marketed its cranes by advertising in trade journals, exhibiting at trade shows, and via the internet. (Balaban Decl., at ¶ 31.)  C2C would attend seven trade shows per year. (Maurer Decl., at ¶ 18.)  Additionally, C2C spent approximately $14,000 per month advertising in the trade publications. (Id.)  C2C also sends out approximately 3,000 mailers per month promoting its cranes. (Id.) Until the fall of 2004, the majority of C2C's crane sales were direct sales to end-users as opposed to through distributors.  C2C's primary business is its crane sales.[4] (Id.)

III. **Coastal's Involvement with Wu Mar Cranes**

Coastal is a New Jersey corporation that "has been in the business of designing, manufacturing, and importing coin operated amusement games and the distribution of these games to wholesale distributors and end users in the United States and abroad" since its formation in 1986. (Mirando Decl., at ¶ 1.)  Coastal's

---

[3] C2C sold: 13 cranes in 2000, 75 cranes in 2001, 265 cranes in 2002, 523 cranes in 2003, 485 cranes in 2004, and 792 cranes as of August 9, 2005. (Balaban Decl., at ¶ 24.)

[4] C2C also has three crane technicians and has a one-year warranty program for new cranes. (Maurer Decl., at ¶ 18.)

5

shareholders are executive vice president Salvatore V. Mirando ("Mirando") and president Leonard Dean ("Dean").  (Id. at ¶¶ 1-2.)

Coastal began importing Wu Mar chocolate candy cranes for distribution in the United States in or around October 2000.[5] (Id. at ¶¶ 6-9, Dean Decl., at ¶¶ 3-4.)  In April 2002, Coastal purchased two sample Toy Soldier Jumbo cranes from Wu Mar, and had one of the samples shipped to NAMCO Cybertainment ("NAMCO") — a major customer of Coastal — for NAMCO's review.  (Mirando Decl., at ¶¶ 10-12.)  After Wu Mar completed NAMCO's request for modifications to the cranes, NAMCO ordered 100 cranes from Coastal; Coastal began to sell these Wu Mar cranes as "Toy Soldier Jumbo" cranes to its wholesale distributors and to other end users.  (Id. at ¶¶ 13-14.)

Coastal, after committing to selling cranes, determined that the best way to develop sales of Wu Mar cranes was to sell the cranes primarily through a network of wholesale distributors. (Id. at ¶ 15.)  Coastal believed that although its margin per Wu

_____

[5] C2C contends that prior to Coastal's interest in Wu Mar cranes, Gary Balaban of C2C ("Balaban") — having known the principals of Coastal for many years — had "numerous" conversations with Coastal about Wu Mar cranes.  (Balaban Decl., at ¶ 25.)  Additionally, C2C states that "C2C disclosed [to Coastal] the particulars about the Wu Mar cranes, including pricing and manufacturing information, the exceptional customer service offered by [Wu Mar] and [Wu Mar's] willingness to accept and incorporate C2C's modifications to the Cranes." (C2C's Br., at 8.)  Coastal disputes C2C's contention and states that its principals had no conversations with Balaban regarding Wu Mar cranes.  (Mirando Decl., at ¶ 8.)

Mar crane sale would be smaller, this marketing strategy would be beneficial because of the increased total unit sales. (Id.)  As part of this strategy, Coastal promoted Wu Mar cranes in advertising and at trade shows. (Id. at ¶ 16.)  Additionally, Coastal maintained a staff of five service technicians to diagnose and solve problems with the cranes. (Id.)  Within three years, Coastal's sales of Wu Mar cranes rose from less than 100 units to over 1,500 units per fiscal year. (Id. at ¶ 22.)  As of September 16, 2005, Coastal had sold 1,124 cranes in 2005. (Id. at ¶¶ 63-64.)

Coastal and Wu Mar agreed to a three-year exclusive distributorship agreement for three brands of Wu Mar cranes in January 2004. (Id. at ¶ 20; Wei Decl., at ¶ 20.)  Coastal also agreed to a minimum annual purchase requirement, but the agreement did not set a resale price for any of the cranes. (Wei Decl., at ¶¶ 20-21.)  At Wu Mar's request, the agreement permitted Wu Mar to continue to sell one brand of crane to C2C. (Id. at ¶ 21; Mirando Decl., at ¶ 20.)  Coastal agreed to the C2C exception to exclusivity because Coastal understood that Wu Mar would not permit C2C to sell to distributors. (Mirando Decl., at ¶¶ 20-21.)

**IV.  Coastal and C2C's Competition in the Amusement Crane Market**

**A.  C2C's Sale of Cranes to Distributors**

C2C hired a salesperson to begin marketing C2C's cranes for sale to distributors in the fall of 2004. (Balaban Decl., at ¶

7

33; Wei Decl., at ¶ 27.)  After C2C began marketing Wu Mar cranes

for sale to distributors, Coastal "expressed concern to Wu Mar

that [C2C's] new strategy would undermine its distribution

network and that [C2C] was capitalizing on Coastal's development

of a demand for Wu Mar brand cranes." (Coastal's Br., at 7; Wei

Decl., at ¶ 29.)  Coastal "asked that Wu Mar request that [C2C]

not sell at the unreasonably low prices that were disrupting the

distributor network, that it not sell to Coastal's distributors,

and that it remove its prices from its written advertising."

(Mirando Decl., at ¶ 30.)

## B. Correspondence Between the Parties Regarding C2C's Sale of Cranes to Distributors

In response to Coastal's concerns, Wu Mar's president, Ming-

Shan Wei ("Wei"), sent an e-mail on September 22, 2004, to C2C,

stating, in pertinent part:

> I heard that you are hiring a salesman and he is doing
> quite a good job for you.
>
> However is it true that your salesman is offering your
> crane as "the same to Coastal's cranes"?  We think it
> is not a good strategy to sell your cranes because your
> are directly competing against our distributor which
> will also hurt our sales and relationship with Coastal.
> Please try to focus to real features of the cranes.
> You don't need to mention that your crane is from the
> same manufacturer of Coastal's crane.  Do you?
>
> Please try to explain your new sales strategy.  What's
> your distribution price now?  We really appreciate your
> support to us but please understand that any of you,
> Coast to Coast and Coastal are important and good
> customers for us.

(Balaban Decl., at ¶ 34 & Ex. E; Wei Decl., at ¶ 29.)

After receiving a response to this e-mail from C2C, Wei replied on September 23, 2004, as follows:

> First of all I want to thank you for your support over all these years.  I would never ask you this favour but being the owner of a company, we must take care of all our customers and make everybody happy (I try) but meanwhile, make decisions that would be the most profitable for us.
>
> I wish you not to "touch" any of the distributors of Coastal concerning to cranes (any of your types).  Please have your salesman to understand this.  You may offer them products that Coastal doesn't offer, but never give them any quotation or try to get cranes orders from them.  Of course there are many distributors very loyal to Coastal, but if you offer them a price lower than Coastal can offer, they can have doubt on Coastal and may cause conflicts betwee[n] them.  It would be good if you can remove your distribution price from the ad.[6]
>
> If you can not promise the above, I will be forced to make a decision to have one sole distributor in the US, which would be the worst thing that I would ever do.  We really appreciate you and John like friends.  But I must maintain a company considering the best for it and if I must make a decision, I will have to say sorry.
>
> Like you say, you have started to offer our crane much before than Coastal.  But we also have to tell you that Coastal is buying much more cranes than you.  Even under this condition, we have always tried to protect your company and cooperate with you in all the modifications or development or requests; even under the pressure from Coastal's complain[t]s (we don't tell you much about this, but we did many many times trying to convince and promise that Coast to Coast will not hurt their sales).

---

[6] C2C in response to Wei's September 22, 2004 e-mail, informs Wu Mar that "[p]art of our new ads will remove all pricing of the cranes, this should make everyone happy." (Balaban Decl., at ¶ 34 & Ex. E; Wei Decl., at ¶ 30.)  This appears to refute C2C's assertion that Wu Mar requested C2C to remove its prices from advertisements.  Instead, C2C intimated to Wu Mar its willingness to remove all pricing from its advertisements without provocation by Wu Mar.

> My biggest wish at this moment is to help you with the
> other new projects and trying to open up more and more
> new customers of the field.  US market is so big and
> the biggest favour from you would be to "occupy" other
> intact market to buy Wu Mar's new games. . . .

(Balaban Decl., at ¶ 35 & Ex. F.)

Wei and Rita Lai (another Wu Mar employee) met with C2C's principals at a trade show in Las Vegas on October 6, 2004.  (Wei Decl., at ¶ 32; Balaban Decl., at ¶ 37.)  During the meeting, Wu Mar suggested that C2C not sell directly to Coastal's customers.  (Wei Decl., at ¶ 32; Balaban Decl., at ¶ 37.)  C2C told Wei that Wu Mar could not dictate to whom and at which price, C2C could sell the cranes.  (Balaban Decl., at ¶ 37.)  Despite opposing Wu Mar's request, C2C acquiesced and provided Wu Mar with a designated list of customers, which included some distributors.  (Id.)  Wu Mar cross-checked the list with Coastal in an attempt to avoid future disagreements and to ensure that C2C was not targeting Coastal's distributors.  (Mirando Decl., at ¶ 32; Wei Decl., at ¶ 33.)  After cross-checking the list with Coastal, Wu Mar learned that two distributors on the list were in the Coastal distribution network and two other distributors directly competed against one of Coastal's largest distributors.  (Wei Decl., at ¶ 34.)

Wu Mar sent C2C another e-mail on December 7, 2004, which stated, in pertinent part:

> As I mentioned before, when I gave [Coastal] the list
> of distributors received at IAAPA from you, they told
> me that Mountain Coin and Discount Arcade are their
> customers so they told me that you can not sell cranes

10

> to them.  They also told us that you can not either
> offer to Bay Coin and East Coast Amusements because
> they are known distributors (re-sellers) that compete
> directly with their distributor.  We must agree with
> Coastal on this because if you are offering your cranes
> to them, you are competing against Wu Mar's cranes
> which is not good for us.
> We repeat again that Coastal accept that Coast to Coast
> sells only to retail operators but never to re-sellers.
> Plea[s]e also hold your retail price to a competitive
> level to not disturb the market pricing and create
> confusion.
>
> Please try to understand the situation.  Mr. Wei and I
> understand that we are limiting your business in cranes
> but if you agree to cooperate with us and follow the
> rules, we will always help you for new products and
> releases in the future.

(Balaban Decl., at ¶ 38 & Ex. G; Wei Decl., at ¶ 35.)  Two days

later, Wu Mar sent a notice to its customers worldwide that it

was raising its sale price five to ten percent to compensate for

fluctuations in currency exchange rates and increased oil and

other raw material costs.  (Wei Decl., at ¶ 36; Balaban Decl., at

¶ 39 & Ex. H.)  In the notice, Wu Mar suggested that its

customers adjust their resale price accordingly.  (Balaban Decl.,

at ¶ 39 & Ex. H.)

C2C stated that Wu Mar's request that it keep a

"competitive" price level was "unacceptable" via e-mail dated

December 10, 2004.  (Wei Decl., at ¶ 37; C2C's Br., at 14.)  C2C

also refused to stop selling cranes to the four distributors

mentioned in the December 7, 2004 e-mail from Wu Mar to C2C.

(Wei Decl., at ¶ 37; Balaban Decl., at ¶ 40 & Ex. I.)  Wu Mar

sent another e-mail to C2C on January 4, 2005, which included a forwarded e-mail from Coastal complaining about C2C offering a Wu Mar crane to one of Coastal's customers for $1250:

> Dear Gary,
>
>                         \* \* \*
>
> Please see the following message from [Coastal.] We are very disappointed that this kind of things is happening again.  We would like to know if this is true.  Can you please give us an explanation?
>
>                         \* \* \*
>
> Rita;
>
> I just received a call from one of our largest customers reporting that Coast to Coast offered the crane to him at $1250.00.  When will this end?
>
> Sal

(Balaban Decl., at ¶ 41 & Ex. J.)

Also on January 4, 2005, Wu Mar responded to C2C's December 10, 2004 e-mail:

> We think that everything is clear as we explained to you already.
>
> 1.    We have signed an agreement with Coastal about 2 years ago.
> 2.    The agreement is almost on "exclusive distribution" basis.  I say "almost" because when Coastal asked the exclusive distribution of cranes, we said NO.
> 3.    They had to accept the exception of Coast to Coast because of the long time relationship of ours.
> 4.    They had to accept this exception, otherwise, we won't sign the agreement with them.  The exception says we can ship cranes series WMH-188.
> 5.    We thought we did not need to tell you nothing by then because we were keeping selling you cranes.  But I made the mistake not have told you that you can not sell through distribution because this was one of

the points in the agreement.  And of course
you can not offer to Coastal's customers.

6.   When you told me last year that in order to
expand your business, you were planing to
sell through distribution; I didn't remember
at that time that it is prohibited by the
agreement with Coastal.  My fault again...

7.   The agreement says that Coastal has the
exclusive right of Wu Mar cranes except
series #188.  Coast to Coast can sell direct
(only series #188) as it was up to that
moment.

8.   Everything was fine before because you or
your people did not go to Coastal's customers
and offer them cranes.  But now because you
have "started the war", they came to reclaim
their right.  Specially because you went
DIRECTLY to their customers.

9.   We had to share the list of distribution
customers to Coastal because we have an
agreement signed.  We can not "hide" the
truth or lie.  If Coastal agrees to the list
of distributors we are fine.  But we must ask
their permission.

10.  As you can see, Coastal had no rejection on
all the companies on the list, but only the
ones that are really their customers.  They
are still buying from Coastal.

We must end this conflict because neither of we 3
companies will be comfortable doing business this way.
You must NOT contact Coastal's customers.  If you
already know who they are and moreover you know that
they are loyal to Coastal why are you creating conflict
by offering them cranes???  What they will only do is
complain to Coastal and the next step to complain to Wu
Mar and finally we must explain and this will never
end...  We are really tired.

So please just promise
Not to offer your cranes to the distributors that
Coastal declares their customers.
You will only sell direct, except those distributors
that Coastal has no comments.

We really wish to keep our business relationship for
long long time.  We can work together to develop more
games in the future.  We know we are limiting your
sells in cranes; but we have an agreement to comply
with.  We could have told you 2 years ago that we can

13

not offer you no more cranes because we were going to
sign an agreement with someone else.  We did not do
that.  Contrary, just because of our relationship.  We
wrote many long e-mails in that If you can't make the
promises or we still get news that your people approach
to Coastal's customers and offer cranes, we must choose
to stay with just one customer of cranes in the US;
which is the end that we won't be happy to see never.

(Balaban Decl., at ¶ 42 & Ex. K; Wei Decl., at ¶ 38.)

Wu Mar sent C2C another e-mail, which included a forwarded

message from Coastal on January 13, 2005, stating:

[From Coastal to Wu Mar]

Rita,

First of all, I am as tired of reporting this
annoyance, as you are of hearing about it.  However, we
must protect our reputation, and I will continue to
demand that you hold Coast to Coast to the original
agreement, or stop selling to them.

I am faxing you a copy of an ad that appeared in the
December issue of Replay magazine advertising Coast to
Coast cranes for sale by Bay Coin, one of the companies
on the list that we insisted that Coast to Coast not
sell.

Bay Coin is in the same area as our largest customer,
Betson Industries, and we are getting pressure from
Betson to stop Bay Coin from selling "the same cranes
as Coastal".  This situation hurts our credibility, and
must be stopped, once and for all.

Sal

[From Wu Mar to C2C]

We did not insist on "Coast to Coast can not sell
through distribution" at all.  But we must respect our
agreement with Coastal, so we showed them the list of
distributors that you intend to sell.  If Coastal agree
with the list, we will definitely agree.  But if they
do not agree on the list, we must stop you to sell to
them.  Coastal could have told us directly that Coast
to Coast must not sell to any distributor in America,
but they just pointed out which ones not.

So now, we must insist that at least you do not sell to
Mountain Coin, Discount Arcade and Bay Coin because the

14

first two distributors are customers of Coastal, too and Bay Coin is the competitor of their biggest customer. Consequently, Coast to Coast indirectly is becoming competitor of Coastal and eventually Wu Mar Harng is becoming competitor of Coastal, which does not make sense and doesn't help to us.

Mr. Wei and I seriously ask you to stop this situation because of the reasons that we told you before. You must stop or we will stop to you. Don't forget that at IAAPA you came to us in the last day and told us that you will not sell cranes through distribution inside of the US. We kindly ask you to re-consider this situation.

Best regards,
Rita Lai

(Balaban Decl., at ¶ 43 & Ex. L.)

## C.   Wu Mar Informs C2C that Wu Mar Will Not Sell Cranes to C2C - Wu Mar and Coastal Enter into Exclusive Distributorship Agreement

Wu Mar informed C2C that it would no longer manufacture cranes for C2C in an e-mail dated March 29, 2005. (Id. at ¶ 45 & Ex. M.). In the e-mail, Wu Mar stated, in pertinent part:

I have to inform you that we have decided to make a very important decision regarding the distribution in the USA. We know that you will be hurt, angry, mad... We had to choose just one distributor for our cranes in the United States at this point. We think this is better for our company. We really appreciate the friendship between both companies during all this time and we hope to keep being friend. The reality sometimes is cruel, business is business, everybody wants to survive in this market with so much competition.

* * *

The cranes sole distribution agreement that we will sign with Coastal will start to be valid since April 1st 2005.

(Id.) Wu Mar and Coastal entered into an exclusive distributorship agreement on April 1, 2005. (Mirando Decl., at ¶ 37; Wei Decl.,

15

at ¶ 45.)  This agreement did not (1) require Coastal to set any specific resale price, or (2) include a suggested resale price. (Wei Decl., at ¶ 46 & Ex. E.)  The agreement allowed C2C two days to place additional crane orders for Wu Mar cranes.  (Id.; Mirando Decl., at ¶ 38.)  C2C ordered seven additional containers of cranes from Wu Mar.[7]  (C2C's Br., at 16.)

**D.   C2C's Opposition to Wu Mar's Refusal to Sell**

C2C sent Coastal a letter, dated May 5, 2005, which advised Coastal that C2C considered Coastal's conduct "to be in direct violation of United States Anti-Trust Laws, New Jersey State Anti-Trust Laws, and New Jersey Common law." (Balaban Decl., at ¶ 47 & Ex. N.)  From May to June 2005, the principals of Coastal and C2C met in an attempt to resolve their issues and discuss the possibility of Coastal acquiring C2C.  (Id. at ¶ 48; Mirando Decl., at ¶ 40.)  The parties agreed that, pending further negotiations, C2C could purchase Wu Mar cranes through Coastal at a $100 mark-up per crane.  (Id.)  In furtherance of the interim arrangement, C2C placed orders for additional cranes.  However, on June 17, 2005, Coastal sent an e-mail to C2C indicating that Coastal would not accept any purchase orders for cranes from C2C. (Balaban Decl., at ¶ 50 & Ex. P; Mirando Decl., at ¶ 41.)

---

[7]  C2C claims to have received only five of the seven containers.  (Balaban Decl., at ¶ 45.)

**E.   C2C's Attempts to Find a Substitute Crane Manufacturer**

Because C2C could no longer purchase cranes from Wu Mar, C2C initially investigated manufacturing its own cranes in the United States, but determined that it would cost approximately $250 to $350 more per crane.[8]  (Balaban Decl., at ¶ 53.)  Also, C2C believed that no United States manufacturers would be willing to manufacture C2C's cranes.  (Id. at ¶ 54.)  As such, C2C purchased cranes from another Asian company, Feiloli Electronic Co., Ltd. ("Feiloli"), for approximately $870 per crane (hereinafter referred to as the "alternate crane").  (Id.)  Some of C2C's customers have refused to purchase the alternative cranes. (Maurer Decl., at ¶ 7.)  C2C has sold and marketed the alternative cranes for approximately four months, and sales of the alternative cranes have made up only 30% of the monthly average number of cranes shipped by C2C over the preceding four months.  (Id. at ¶ 13.)  C2C "is virtually out of Wu Mar Cranes[,]" and it has no confirmed orders for alternative cranes in the "pipeline".  (Id. at ¶¶ 4, 15.)

## CONCLUSIONS OF LAW

C2C moves to enjoin (1) the termination of the contractual relationship between C2C and Wu Mar, (2) Wu Mar from failing and

---

[8] These amounts were for a crane with a wooden cabinet. (Balaban Decl., at ¶ 53.)  C2C determined that the cost for a metal cabinet, similar to Wu Mar cranes, was even greater.  (Id.)

17

refusing to provide C2C with Wu Mar cranes, consistent with orders placed by C2C, (3) Coastal and Wu Mar from setting or controlling the prices at which C2C may sell Wu Mar cranes, and (4) the defendants from controlling the customers to whom C2C may sell Wu Mar cranes. (C2C's Prop. Ord.) The Court finds that C2C has not satisfied the elements of a preliminary injunction such that its requested relief is warranted.[9] The findings and conclusions set forth in this opinion are preliminary only, based upon the state of the record at this stage in the litigation. See Fed.R.Civ.P. 65(a). The parties have preserved all rights to present their disputes to a fact-finder for eventual adjudication on the merits.

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) (internal citation omitted). The Court must consider whether: (1) the party seeking a preliminary injunction has shown a reasonable probability of success on the merits; (2) the party

---

[9] To the extent that the "Conclusions of Law" portion of this memorandum opinion contains findings of fact in addition to those expressly set out under the heading "Chronology of Events-Factual Findings," they shall be deemed to be part of the findings of fact.

The "Conclusions of Law" subsections of this memorandum opinion generally do not contain citations to the evidence except after quoted language. The record citations are set forth in the "Chronology of Events-Factual Findings" section of this memorandum opinion.

will be irreparably injured by the denial of the relief; (3) granting preliminary relief will result in even greater harm to the nonmoving party; and (4) granting the preliminary relief will be in the public interest.  Allegheny Energy v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999) (citation omitted).  "The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." AT&T Co. v. Winback & Conserve Program, 42 F.3d 1421, 1427 (3d Cir. 1994) (citations omitted).

C2C requests that the Court, inter alia, order Wu Mar to continue selling its cranes to C2C, which it ceased doing pursuant to its exclusive distributorship agreement with Coastal. As such, C2C is seeking a mandatory injunction.  An injunction is mandatory if the injunction will either (1) "alter the status quo by commanding some positive act" or (2) provide the moving party with "substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." Tom Doherty Assoc. v. Saban Entm't, 60 F.3d 27, 33-34 (2d Cir. 1995).[10]  Where a plaintiff seeks a mandatory injunction rather than a prohibitory injunction, the burden of showing an entitlement to the preliminary injunction is greater, as mandatory injunctions are generally disfavored.  Edge v. Pierce,

---

[10] A preliminary injunction is prohibitory if it "seeks only to maintain the status quo pending a trial on the merits." Tom Doherty, 60 F.3d at 33.

19

540 F.Supp. 1300, 1303 (D.N.J. 1982); see United States v. Spectro
Foods Corp., 544 F.2d 1175, 1181 (3d Cir. 1976) (stating that the
court's power to issue a preliminary injunction, especially a
mandatory injunction, should be "sparingly exercised").

The injunctive relief analysis here centers on the first two
essential factors listed above.  The Court will discuss each
party's contentions concerning the motion.

## I.   Reasonable Probability of Success on the Merits

The party seeking a preliminary injunction must demonstrate
a "reasonable probability of eventual success in the litigation."
Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982).  In
evaluating whether a moving party has satisfied this first part
of the preliminary injunction standard, "[i]t is not necessary
that the moving party's right to a final decision after trial be
wholly without doubt; rather, the burden is on the party seeking
relief to make a [p]rima facie case showing a reasonable
probability that it will prevail on the merits." Oburn v. Shapp,
521 F.2d 142, 148 (3d Cir. 1975) (citations omitted).

## A.   Sherman Act § 1 Violation; Violation of NJAA § 56:9-3

C2C alleges that the defendants "engaged in a per se unlawful
contract, combination or conspiracy, seeking to control, set and
fix the resale prices at which Wu Mar Cranes can be resold by Wu
Mar distributors, such as C2C." (Compl., at 24.)  In support of
its allegation, C2C asserts that the defendants' agreement and

20

"collusive activity . . . resulted in excluding C2C from purchasing Wu Mar Cranes solely because C2C was selling Wu Mar cranes at a price below the minimum price level fixed by Wu Mar at the insistence of Coastal." (C2C's Br., at 20.)  As such, C2C claims that the defendants acted with no competitively acceptable justification and committed a <u>per</u> <u>se</u> violation of the Sherman Act and the NJAA.  We find that C2C has failed to demonstrate a reasonable likelihood of success on the merits of these claims.[11]

1.   <u>The Restraint Requirement</u>

Section 1 of the Sherman Act ("Section 1") provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. Nonetheless, since "[e]very agreement concerning trade, every regulation of trade, restrains," the broad language of Section 1 prohibits only restraints that unreasonably restrict competition. <u>Chi. Bd. of Trade v. United States</u>, 246 U.S. 231, 238 (1918); <u>Stand. Oil Co. v. United States</u>, 221 U.S. 1, 58 (1911).  There are two methods of evaluating whether an alleged restraint of trade is unreasonable: the restraint (1) falls within a class of

_____

[11] In the first count and the second count, C2C alleges that the defendants violated Section 1 of the Sherman Act and NJAA § 56:9-3, respectively.  As C2C admits, these provisions essentially mirror one another, and as the state cases look to federal decisions for guidance, the Court addresses these claims together for the purposes of this motion.  (C2C's Br., at 21 n.1 (citing <u>Michael Halebian N.J., Inc. v. Roppe Rubber Corp.</u>, 718 F.Supp. 348, 355 (D.N.J. 1989) (citations omitted)).

restrictions that is <u>per</u> <u>se</u> unlawful, or (2) is unlawful under a

"rule of reason" analysis.[12]

a.   Illegality under the <u>per</u> <u>se</u> rule

The <u>per</u> <u>se</u> rule is appropriate only when the alleged

unlawful restraint relates to conduct that is manifestly anti-

competitive.   "[T]here are certain agreements or practices which

because of their pernicious effect on competition and lack of any

redeeming virtue are conclusively presumed to be unreasonable and

therefore illegal without elaborate inquiry as to the precise

harm they have caused or the business excuse for their use." <u>N.</u>

<u>Pac. R.R. Co. v. United States</u>, 356 U.S. 1, 5 (1958).   Vertical

minimum resale price restraints are <u>per</u> <u>se</u> unlawful.[13]   <u>324</u>

_____

[12] Although C2C did not brief a Section 1 claim under a rule
of reason analysis, it did mention this alternative theory in its
complaint.  (<u>See</u> Compl., at ¶¶ 71,72.)
    C2C has not asserted that the Court apply the "quick look"
rule of reason analysis.  <u>See</u> <u>NCAA v. Bd. of Regents</u>, 468 U.S.
85, 109-10 n.39 (1984).  The "quick look" rule of reason analysis
would permit the Court to examine the alleged restraints without
defining the relevant market because market power is but "a
surrogate for detrimental effect." <u>See</u> <u>FTC v. Ind. Fed'n of</u>
<u>Dentists</u>, 476 U.S. 44, 458-61 (1986) (stating that "no elaborate
industry analysis is required" to condemn direct restraint on
output where evidence of actual adverse effects on competition is
clear).  This abbreviated analysis is appropriate only where "an
observer with even a rudimentary understanding of economics could
conclude that the arrangements in question have an
anticompetitive effect on customers and markets." <u>Cal. Dental</u>
<u>Ass'n v. FTC</u>, 526 U.S. 756, 770 (1999).

[13] Vertical price fixing is an agreement between actors at
different market levels (e.g., supplier and distributor)
establishing the resale price or range of prices for products and
services.  ABA Section of Antitrust Law, <u>Antitrust Law</u>
<u>Developments</u>, 130 & n.738 (5th ed. 2002).

Liquor Corp. v. Duffy, 479 U.S. 335, 341-43 (1987); United States v. Parke, Davis & Co., 362 U.S. 29, 47 (1960); Dr. Miles Med. Co. v. John D. Park & Sons Co., 220 U.S. 373, 407-08 (1911). However, "a vertical restraint is not illegal per se unless it includes some agreement on price or price levels." Bus. Elecs. Corp. v. Sharp. Elecs. Corp., 485 U.S. 717, 735-36 (1988).

b.   Illegality under the rule of reason

The rule of reason is "the prevailing standard" of analysis for claims under Section 1 and the majority of anticompetitive practices challenged thereunder.  See, e.g., Bus. Elecs., 485 U.S. at 723, 726.  Additionally, "[t]here is a presumption in favor of a rule-of-reason standard." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).  The rule of reason standard requires the plaintiff to show: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action." Petruzzi's IGA Supermarkets v. Darling-Del. Co., 998 F.2d 1224, 1229 (3d Cir. 1993).  Because of the presumption in favor of the rule of reason standard, if the plaintiff cannot demonstrate a per se violation of Section 1, the Court must analyze the plaintiff's claims under the rule of reason standard. Bus. Elecs., 485 U.S. at 425.

23

"Under [the rule of reason standard], the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." GTE Sylvania, 433 U.S. at 49.  The plaintiff must show initially that "the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets." United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993) (citations omitted).  The plaintiff, having an almost impossible probability of demonstrating actual anticompetitive effects, satisfies this initial burden by presenting proof of the defendant's market power.  Id. (citations omitted).

Once a plaintiff satisfies this initial burden, the burden shifts to the defendant to "show that the challenged conduct promotes a sufficiently pro-competitive objective." Id. at 669. Thereafter, the burden shifts back to the plaintiff to demonstrate that the "restraint is not reasonably necessary to achieve the stated objective." Id. (citations omitted).  Thus, the Court must determine:

> whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.  To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.  The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

24

<u>Chi. Bd. of Trade</u>, 246 U.S. at 238.  Therefore, under the rule of reason analysis, "the test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."  <u>Id.</u>

2.  <u>Application of the Per Se Rule</u>

C2C claims that the defendants conspired or agreed to fix prices (or price levels) for Wu Mar cranes, and therefore committed a <u>per se</u> violation of Section 1.  The defendants contend that C2C cannot demonstrate a reasonable likelihood of success on the merits of its Section 1 violation claim because: (1) C2C has not provided sufficient evidence of an agreement between the defendants to fix minimum prices or a minimum price level, and (2) Wu Mar's decision to cease selling cranes to C2C was a unilateral business decision in furtherance of its legitimate business interests.  (Coastal's Br., at 17, 21; Wu Mar's Br., at 6.).  The Court finds that C2C has failed to demonstrate (1) an agreement between the defendants to fix minimum prices or price levels, or (2) that Wu Mar's decision to cease selling cranes to C2C was not an independent business decision.

a.  The requirement of concerted action or an agreement

Section 1 liability is premised on "concerted action."  <u>See</u> <u>In re Baby Food Antitrust Litig.</u>, 166 F.3d 112, 117 n.3 (3d Cir. 1999) ("The phrase 'concerted action' is often used as shorthand

for any form of activity meeting the Section 1 'contract . . . combination or conspiracy' requirement.").  Thus, regardless of whether the alleged conduct falls within the per se rule, the threshold question presented before the Court is whether C2C has provided evidence establishing that the defendants were part of a concerted effort to restrain trade.

"The very essence of a section 1 claim, of course, is the existence of an agreement." Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 999 (3d Cir. 1994).  The plaintiff must show a "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984) (citations and quotations omitted).  "A plaintiff may utilize either direct or circumstantial evidence in order to make out the element of concerted action." Rossi v. Stand. Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998).

"Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." In re Baby Food, 166 F.3d at 118; see Rossi, 156 F.3d at 466 ("[W]hen the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts").  But where the plaintiff fails to adduce direct evidence of a conspiracy, the inferences to be drawn from circumstantial evidence are

circumscribed.  <u>Rossi</u>, 156 F.3d at 465-66.  The plaintiff must produce evidence "that tends to exclude the possibility that the manufacturer and nonterminated distributor[] were acting independently. . . .  [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious scheme designed to achieve an unlawful objective." <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752, 764 (1984) (citations and quotations omitted).[14]

C2C claims that it "has submitted proof of the existence of an actual agreement between Wu Mar and Coastal and has evidence that tends to demonstrate a common understanding between Wu Mar and Coastal to maintain minimum resale prices at the level dictated by Coastal." (C2C's Br., at 24.)  C2C, in support, relies mainly on the e-mail correspondence between Wu Mar and C2C, some of which contains messages from Coastal to Wu Mar.

---

[14] In <u>Monsanto</u>, a case brought by a terminated distributor, the Supreme Court found sufficient direct evidence of an agreement between Monsanto and other distributors to maintain prices to create a jury issue.  The direct evidence was: (1) threatening action by a Monsanto manager against other price cutters shortly after the plaintiff's termination, followed by the subsequent consent of one of those parties to maintain prices at suggested levels; (2) evidence of discussions between Monsanto and the plaintiff of other distributors' complaints and requests to keep prices up; (3) explicit threats to terminate the plaintiff unless prices were raised; and (4) a distributor-customer newsletter published just before the termination of the plaintiff which discussed Monsanto's efforts to "ge[t] the 'market place in order.'" <u>Id.</u> at 765-68.

C2C points out that the e-mail from Wu Mar to C2C dated September 23, 2004, "demands C2C to remove its prices from certain advertising and to refrain from offering Cranes at a lower price than Coastal." C2C, however, has mischaracterized the content of this correspondence.  The September 23, 2004 e-mail does state that "it would be good if you can remove your distribution price from the ad[.]" However, this appears to be simply an acknowledgment by Wu Mar in acceptance of C2C's suggestion in C2C's September 22, 2004 e-mail to Wu Mar that "[p]art of our new ads will remove all pricing of the cranes[.]" C2C has not provided any evidence that Wu Mar "demanded" C2C to remove pricing from its advertisements.  (See Balaban Decl., at ¶ 35 & Ex. F.)  Second, C2C claims that Wu Mar's December 9, 2004 notice "requir[ed] its customers to increase the resale prices of the Wu Mar Cranes." Although this notice did ask customers to "[p]lease adjust your distribution selling rates now accordingly[,]" a fair reading of this language does not indicate that Wu Mar "required" its customers to raise their resale prices.  Instead, Wu Mar was suggesting to its customers — because the wholesale price of its cranes was increasing five to ten percent — to raise their distribution prices accordingly so its customers could continue to make the same profit from selling Wu Mar cranes that they had previously.

The Court finds that the e-mail correspondence shows that Wu Mar asked C2C to refrain from selling its cranes to Coastal's

28

existing customers at a price lower than Coastal's.  In addition, Wu Mar did tell C2C that if it did not comply with Wu Mar's request, Wu Mar might stop selling its cranes to C2C.  The correspondence also shows that Wu Mar was receiving numerous complaints from Coastal about C2C selling its cranes to Coastal's customers at a price lower than Coastal's resale price. Moreover, Coastal admits to complaining to Wu Mar about C2C and demanding that Wu Mar correct the situation.  (Mirando Decl., at ¶ 30.)  Nevertheless, despite the foregoing discussion, the Court cannot, as C2C suggests, infer that an agreement between the defendants to fix prices existed from the mere "existence of complaints, or even from the fact that termination came about 'in response to' complaints." <u>Monsanto</u>, 465 U.S. at 763; <u>see</u> <u>Bus.</u> <u>Elecs.</u>, 485 U.S. at 731 (disagreeing with the "petitioner's contention that an agreement on the remaining dealer's price or price levels will so often follow from terminating another dealer 'because of [its] price cutting'").

A manufacturer's termination of a discounting distributor, in response to complaints from another distributor, is insufficient by itself to prove an illegal price-fixing conspiracy.  <u>See</u> <u>Monsanto</u>, 465 U.S. at 760-64.  In addition,

> [p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about "in response to" complaints, could deter or penalize perfectly legitimate conduct. . . . [C]omplaints about price-cutters "are natural--and from the manufacturer's perspective, unavoidable--

29

reactions by distributors to the activities of their rivals." Such complaints . . . "arise in the normal course of business and do not indicate illegal concerted action." Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market. In sum, "[t]o permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of independent business judgment and emasculate the terms of the statute."

Id. at 763-64 (citations omitted). Moreover,

the fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions. A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market. Moreover, it is precisely in cases in which the manufacturer attempts to further a particular marketing strategy by means of agreement on often costly nonprice restrictions that it will have the most interest in the distributors' resale prices. The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product, and will want to see that "free-riders" do not interfere. . . . Thus, the manufacturer's strongly felt concern about resale prices does not necessarily mean that it has done more than the *Colgate* doctrine allows.

Id. at 762-63.

An antitrust plaintiff "must be prepared to demonstrate a causal relationship between alleged dealer complaints and a

30

distributor's action in order to show that the concerted action in violation of the Sherman Act is distinguishable from 'perfectly legitimate' independent conduct." Big Apple BMW v. BMW of N. Am., 974 F.2d 1358, 1364 (3d Cir. 1992) (citation omitted) (emphasis in original).  "In that regard, proof of causation requires more than a sequence of dealer complaints to a distributor that are followed by the distributor's conduct alleged to violate antitrust laws. . . .; the plaintiff must demonstrate adequately a unity of purpose or a common design and understanding, or a meeting of the minds." Id. (citations and quotations omitted).  Therefore, the Court will exercise caution when drawing inferences from such facts because "a fine line demarcates concerted action that violates antitrust law from legitimate business practices." Id. at 1363 (citation omitted).  Accordingly, Coastal's mere complaints to Wu Mar about C2C selling Wu Mar cranes to Coastal's customers at a price below that which Coastal sold the cranes is insufficient to establish a violation of Section 1.

C2C has not presented sufficient evidence from which the Court could infer that the defendants entered into a price-fixing conspiracy and terminated C2C as a distributor in furtherance of that conspiracy.  On the contrary, the evidence shows that Coastal complained to Wu Mar about C2C's price-cutting practice and used its position because (1) of its semi-exclusive distributorship agreement with Wu Mar, and (2) it bought

31

significantly more cranes from Wu Mar than C2C to pressure Wu

Mar.  Wu Mar, in turn, terminated C2C after C2C continued to

market its cranes to distributors at lower prices.

C2C has offered no evidence that reasonably tends to

demonstrate that the defendants agreed to the resale price or

price level for Wu Mar's cranes.[15]  There is nothing in the record

indicating that Wu Mar required Coastal to sell Wu Mar cranes for

any particular price.  In fact, Coastal was free to choose

whatever resale price it wanted, and could, if it wanted to, sell

at a price lower than C2C (although it chose not to do so).  Even

---

[15] See, e.g., Ben Elfman & Sons, Inc. v. Criterion Mills,
Inc., 774 F.Supp. 683 (D. Mass. 1991).  Plaintiff Ben Elfman &
Sons, Inc. ("Elfman"), a price-cutter, expanded its operations
into New York and New Jersey, where it competed with defendant
Benj. Berman, Inc. ("Berman"), a large and long-standing
distributor of defendant manufacturer Criterion Mills, Inc.
("Criterion").  Id. at 685.  Both distributors priced their
products independently of Criterion, but Berman wanted Elfman to
raise its prices and complained to Criterion: "The problem [with
Elfman's pricing] has escalated to a point beyond which we can
tolerate.  You do what you must, we'll do what we must." Id. at
n.6.  Criterion terminated Elfman's distributorship.  Id.
     Elfman alleged essentially that Berman "set a level of
prices which Criterion asked Elfman, another distributor, to
meet." Id. at 686.  The court found that Elfman presented
insufficient evidence to show an agreement between Criterion and
Berman as to Berman's resale prices or price levels.  Id.  Also,
the court explained that the only inference that it could draw
from Elfman's evidence was not an inference of a price-fixing
agreement, but simply that Criterion preferred Berman's business
(and prices) to Elfman's.  Id.  As such, the court granted
summary judgment in favor of the defendants.  Id. at 687.
     The reasoning of Elfman is applicable here: When one
distributor threatens or complains to a manufacturer about
continuing to deal with a discounter, and the manufacturer
independently determines that it would be more beneficial to keep
the non-price cutting distributor, there is insufficient evidence
of a Section 1 conspiracy.

after executing the April 1, 2005 exclusive distributorship
agreement, Coastal was free to choose its own resale price.[16]

b.   Unilateral refusal to deal

Absent proof by the plaintiff of concerted action, "a
manufacturer has a right to deal or refuse to deal with whomever
it likes as long as it does so independently." <u>Monsanto</u>, 465 U.S.
at 761 (citations omitted).  Moreover, a "manufacturer can
announce its resale prices in advance and refuse to deal with
those who fail to comply.  And a distributor is free to acquiesce
in the manufacturer's demand [of recommended pricing] in order to
avoid termination." <u>Id.</u>

The Court finds nothing in the record suggesting that Wu
Mar's action in terminating its relationship with C2C was
anything other than a perfectly legitimate independent business
decision.  After Wu Mar started receiving complaints from
Coastal, Wu Mar was concerned that C2C's actions would cause
Coastal to either cut back on its marketing efforts to compensate
for lower prices or to stop selling Wu Mar's cranes altogether.
(Wei Decl., at ¶ 29.)  Wu Mar determined that C2C's tactics

_____

[16] Even if the Court found that the defendants had agreed to
terminate C2C because of its price-cutting tactics, that alone
would not suffice to establish a Section 1 violation.  An
agreement between a manufacturer and a dealer to terminate
another dealer because it is a price cutter is insufficient to
establish an antitrust violation.  The violation only exists when
the manufacturer and dealer agree on the resale price or price
level that the dealer is to charge customers.  <u>Bus. Elecs.</u>, 485
U.S. at 726-27.

threatened the integrity of the distributor network that Wu Mar had developed in the United States.  (Id. at ¶ 31.)  Moreover, Wu Mar and Coastal had agreed, as part of the semi-exclusive distributorship agreement, that Wu Mar would not sell cranes to C2C if C2C sold the cranes to distributors in the United States. Thus, Wu Mar had an independent justification to ensure that C2C did not sell to distributors because Wu Mar did not want to breach its agreement with Coastal.  Furthermore, Wu Mar independently determined that Coastal had (1) purchased significantly more cranes from Wu Mar than C2C over the preceding three years, (2) "developed a robust network of distributors and had shown a commitment to fostering these distributor relationships," and (3) developed a business model which offered greater growth potential than the "unfocused approach followed by C2C." (Id. at ¶¶ 41-43.)  Therefore, C2C has failed to demonstrate that Wu Mar's decision to terminate C2C was anything other than a justifiable unilateral business decision.

C2C does not make a factual showing that (1) reasonably tends to demonstrate an agreement or conspiracy between the defendants to set prices or price levels, either express or implied, or (2) Wu Mar's decision to stop selling cranes to C2C was anything other than a independent business decision.  Thus, the Court concludes that C2C has not established a reasonable likelihood of success on its Section 1 per se violation claim.

34

3.   <u>Application of the Rule of Reason Standard</u>

The Court has concluded that C2C has not produced sufficient evidence of an agreement between the defendants to fix the resale price or price level of Wu Mar cranes, thereby creating a vertical restraint to fix prices, which is a <u>per se</u> violation of Section 1.  The Court will now apply the "rule of reason" analysis to C2C's Section 1 claim.[17]

The rule of reason standard requires C2C to show: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action." <u>Petruzzi</u>, 998 F.2d at 1229.  Even assuming that, arguendo, C2C demonstrated a vertical non-price restraint, a vertical non-price restraint is not unreasonable unless C2C can demonstrate that the restraint impacts interbrand competition.[18]  <u>Bus. Elecs.</u>, 485 U.S. at 724-

---

[17] Although C2C includes a Section 1 claim under the rule of reason analysis in its complaint (Compl., at ¶ 72), C2C failed to either: (1) provide a rule of reason argument in its brief or reply brief, and (2) argue this point at oral argument.  (<u>See</u> dkt. entry no. 17.)

[18] As the defendants admit, the April 2004 semi-exclusive distributorship agreement included an agreement that Wu Mar would not sell cranes to C2C if Coastal sold the cranes to distributors.  As such, C2C has introduced sufficient evidence that the defendants agreed to a vertical non-price restraint — restricting to whom C2C could sell Wu Mar cranes.

25.  To establish a restraint on interbrand competition, C2C must show that the defendants have market power in the relevant product or geographic market.

C2C has not presented sufficient evidence that Coastal possesses market power in the relevant product market. Specifically, C2C has failed to demonstrate that the relevant product market is limited to Wu Mar brand cranes.  In this case, the determination of the relevant product market is critical because if the market is limited to Wu Mar cranes sold in the United States, Coastal would have a complete market share pursuant to its exclusive distributorship agreement with Wu Mar. Alternatively, if the market is defined more broadly as the amusement crane market, C2C cannot prevail because the uncontradicted evidence of record shows (and C2C does not contend) that Coastal does not have market power in the broader amusement crane market.

C2C has the burden of defining the relevant market.  <u>Tunis Bros. Co. v. Ford Motor Co.</u>, 952 F.2d 715, 726 (3d Cir. 1991). Without defining the relevant market, "there is no way to measure [a defendant's] ability to lessen or destroy competition." <u>Walker Process Equip. v. Food Mach. & Chem. Corp.</u>, 382 U.S. 172, 177 (1965).  The relevant market consists of the products that have reasonable interchangeability by consumers for the same purposes. <u>United States v. E. I. du Pont de Nemours & Co.</u>, 351 U.S. 377,

404 (1956).  Thus, in determining the relevant market, the
question for the Court is not whether one product is a perfect
substitute for another, but whether the two products are
"reasonably interchangeable." See id. (stating market "is
composed of products that have reasonable interchangeability for
the purposes for which they are produced--price, use and qualities
considered").  "[I]n most cases, proper market definition can be
determined only after a factual inquiry into the commercial
realities faced by consumers." Queen City Pizza v. Domino's
Pizza, 124 F.3d 430, 436 (3d Cir. 1997) (citation omitted)).

　　"'The outer boundaries of a product market are determined by
the reasonable interchangeability of use or the cross-elasticity
of demand between the product itself and substitutes for it.'"
Id. (citations and quotations omitted).  The term
"interchangeability" implies that

> one product is roughly equivalent to another for the
> use to which it is put; while there may be some degree
> of preference for one over the other, either would work
> effectively.  A person needing transportation to work
> could accordingly buy a Ford or a Chevrolet automobile,
> or could elect to ride a horse or bicycle, assuming
> those options were feasible." When assessing reasonable
> interchangeability, "[f]actors to be considered include
> price, use, and qualities." Reasonable
> interchangeability is also indicated by "cross-
> elasticity of demand between the product itself and
> substitutes for it." . . . "[P]roducts in a relevant
> market [are] characterized by a cross-elasticity of
> demand, in other words, the rise in the price of a good
> within the relevant market would tend to create a
> greater demand for other like goods in that market."

Id. at 437-38 (internal citations omitted); see also, but inter

37

alia du Pont, 351 U.S. at 404 (rejecting limited relevant market definition to cellophane and explaining that "[i]f a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between them; that the products compete in the same market"). If the plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . ., the relevant market is legally insufficient[.]" Queen City Pizza, 124 F.3d at 436 (citations omitted).

The relevant product market is also "the area of effective competition" within which a defendant's products compete. Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961). Products are included in a single relevant market when they "have the ability--actual or potential--to take significant amounts of business away from each other." Allen-Myland, Inc. v. Int'l Bus. Mach. Corp., 33 F.3d 194, 206 (3d Cir. 1994) (citations and quotations omitted). In addition, "[s]pecial characteristics of the relevant industry may influence market definition." Tunis Bros., 952 F.2d at 726 (citation omitted). Nonetheless, a plaintiff cannot prove the relevant market through

38

generalizations about any particular industry, but instead must demonstrate the economic and commercial realities of the particular market studied.  <u>Eastman Kodak Co. v. Image Technical Servs.</u>, 504 U.S. 451, 467 (1992).

C2C claims that the relevant market is limited to Wu Mar brand cranes.[19]  C2C contends that the Court should construe the relevant product market to be limited to Wu Mar cranes because, <u>inter</u> <u>alia</u>: (1) "the unique production of Wu Mar Cranes, distinct prices, and specialized vendors (i.e. C2C and Coastal) make Wu Mar Cranes a separate economic entity[,]" and (2) the demand for Wu Mar cranes did not decrease after its December 9, 2004 notice that it was increasing prices of the cranes by five to ten percent.  (C2C's Br., at 27-28.)  Also, the plaintiffs assert that Wu Mar cranes are not interchangeable with any other brand of cranes.  (Dkt. entry no. 17; Balaban Decl., at ¶ 56.)

C2C has submitted declarations from John Maurer ("Maurer") and Balaban, both of whom are members and managers of C2C. Balaban opines that "the Cranes manufactured by [Wu Mar] enjoy their own market because the cost to purchase and import them is less than the cost for domestically manufactured cranes.  Yet, Wu Mar Cranes are of comparable quality in design and function."

---

[19] C2C argues that Wu Mar cranes are the relevant product market in the context of its Section 2 violation claim.  However, because the rule of reason analysis requires the Court to determine the relevant product market, C2C's contentions are analyzed here.

(Balaban Decl., at ¶ 15.)  Balaban also explains that Wu Mar cranes are the "best quality at the lowest price." (Id.)

Balaban also discusses the six companies (excluding C2C and Coastal) that sell amusement cranes in the United States.  (Id. at ¶ 19.)  He attests to the price of these other cranes and provides his "opinion" as to whether the cranes are comparable in quality to Wu Mar cranes.  (Id.)  Balaban goes on to state that after Wu Mar ceased selling cranes to C2C, C2C investigated manufacturing its own cranes in the United States, but determined that it would cost C2C an additional $250 to $350 (per crane) to manufacture a comparable crane.  (Id. at ¶ 53.)  Finally, he states that C2C is working with one manufacturer in Asia to purchase cranes, but that the cranes "being offered are significantly inferior to Wu Mar's Cranes," although they are purchased at a lower price.  (Id. at ¶ 56.)  Balaban opines that the Wu Mar cranes are superior to these new cranes because they offer a number of additional features.  (Id.)

Maurer explains that C2C, in an attempt to mitigate its damages, has purchased alternative cranes manufactured by Feiloli.  (Maurer Decl., at ¶ 5.)  Maurer reiterates Balaban's opinion that these new cranes are "significantly inferior" to Wu Mar cranes.  (Id. at ¶ 6.)  Maurer further states that several customers have rejected the alternative cranes, and that the internal gears of the alternative cranes do not have metal gears

40

like Wu Mar cranes, but instead have plastic gears.  (<u>Id.</u> at ¶¶ 7-9.)  Moreover, the sales of the alternative cranes have "made up only 30% of the monthly average of cranes shipped by C2C over the past four months." (<u>Id.</u> at ¶ 13.)  Furthermore, he opines that "the traditional C2C customers are not interested in the [alternative cranes] and it is expected that C2C's sales will continue to plummet next month." (<u>Id.</u> at ¶ 16.)

The defendants argue that the relevant market cannot be defined by only Wu Mar cranes because: (1) C2C improperly relies on the impermissible lay opinions of Balaban,[20] (2) Wu Mar cranes compete with a number of other brands of cranes, (3) the fact that C2C can purchase and import Wu Mar cranes for less than domestically manufactured cranes is insufficient to establish a market definition, (4) C2C is actually importing and selling cranes manufactured by one of Wu Mar's leading competitors, (5) the defendants do not have the ability to control the price of amusement cranes — i.e., a rise in the price of Wu Mar cranes would result in buyers going to other manufacturers, and (6) C2C has presented no factual evidence that after Wu Mar raised its price for cranes the demand for its cranes did not waiver. (Coastal's Br., at 25-29; Wu Mar's Br., at 13-17.)

---

[20] The Court, although the defendants did not claim as such, assumes for purposes of this opinion that the defendants are equally opposed to Maurer's "opinions".

The defendants contend first that the Court cannot define the relevant market as being limited to Wu Mar cranes based upon the information provided in Balaban's declaration. Specifically, the defendants argue that Balaban's statements concerning the relevant market constitute inadmissible lay opinions. In support of their argument, the defendants rely on <u>American Key Corp. v. Cole National Corp.</u>, 762 F.2d 1569 (11th Cir. 1985), which concluded that a plaintiff's proposed market definition cannot be based upon lay opinion testimony. <u>Id.</u> at 1579-80.

The defendants have not pointed to any Third Circuit case holding that a plaintiff must introduce expert testimony to establish the relevant market. In fact, courts are divided as to whether any such requirement is necessary.[21] Although expert

---

[21] Some courts find that expert testimony is necessary. <u>See, e.g.</u>, <u>Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.</u>, 924 F.2d 1484, 1490 (9th Cir. 1991) (concluding that principals in case were not experts "qualified to opine on a highly technical economic question[,]" i.e. the definition of the relevant product market); <u>Berlyn, Inc. v. Gazette Newsp.</u>, 223 F.Supp.2d 718, 727 & n.3 (D. Md. 2002) (stating that "to prove [the] relevant market, expert testimony is of utmost importance, and that testimony, or any other evidence, must be based on specific facts pertaining to the proposed market"); <u>Va. Vermiculite, Ltd. v. W.R. Grace & Co.</u>, 108 F.Supp.2d 549, 576 n.16 (W.D. Va. 2000) (explaining expert testimony practically necessary for market definition). Other courts have held that expert testimony is not required to define the relevant product market. <u>Cf.</u> <u>Brooke Group, Ltd. v. Brown & Willamson Tobacco Corp.</u>, 509 U.S. 209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."); <u>see, e.g.</u>, <u>Anti-Monopoly, Inc. v. Hasbro, Inc.</u>, 958 F.Supp. 895, 904 (S.D.N.Y. 1997) ("[E]xperts are not always essential to defining the relevant market[.]").

testimony may be useful to the Court in defining the relevant product market, for purposes of this opinion, the Court will consider the information provided in C2C's declarations.  Even after considering that information, C2C has not demonstrated that the relevant product market should be limited to Wu Mar cranes.

Relevant markets are rarely limited to a single manufacturer's products.  See, e.g., Town Sound & Custom Tops v. Chrysler Motors Corp., 959 F.2d 468, 479-80 (3d Cir. 1992) (refusing to limit market to Chrysler cars, finding that Chrysler cars competed with other companies' cars); see also Todd v. Exxon Corp., 275 F.3d 191, 200 & n.3 (2d Cir. 2001) (describing general rule against limiting relevant market to a single brand and numerous decisions by other courts holding that a single brand could not constitute a relevant product market).[22]  The Court will not limit the relevant market to a single manufacturer's products because although "one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. . . . [T]his power . . . is not the power that

_____

[22] "[A]bsent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market." Domed Stadium Hotel v. Holiday Inns, 732 F.2d 480, 488 (5th Cir. 1984); accord Grappone, Inc. v. Subaru of New England, 858 F.2d 792, 797 (1st Cir. 1988); Mozart Co. v. Mercedes-Benz of N. Am., 833 F.2d 1342, 1346-47 (9th Cir. 1987); A.I. Root Co. v. Computer/Dynamics, Inc., 806 F.2d 673, 675-76 (6th Cir. 1986); Neumann v. Reinforced Earth Co., 786 F.2d 424, 428-30 (D.C. Cir. 1986); Will v. Comprehensive Acct. Corp., 776 F.2d 665, 673-74 (7th Cir. 1985).

43

makes an illegal monopoly.  Illegal power must be appraised in terms of the competitive market for the product." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 393 (1956).

In rare instances "a well-defined submarket may constitute a relevant product market and so under certain circumstances a relevant product market could consist of one brand of a product, placing intraband competition at issue." Tunis Bros. 952 F.2d at 723.  "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe, 370 U.S. at 325.

The cases that C2C cites in support of its claim that the relevant product market should be limited to Wu Mar cranes are inapposite.  Although the Supreme Court, in Kodak, concluded that in some circumstances, a single brand or service may constitute a relevant market, "[t]his is correct [only] where the commodity is unique, and therefore not interchangeable with other products." Queen City Pizza, 124 F.3d at 439 (citation omitted).[23]

---

[23] C2C cites to Fineman v. Armstrong World Industries, Inc., 980 F.2d 171, 199 (3d Cir. 1992), for the proposition that "in some instances one brand of a product can constitute a separate market." After reviewing Fineman, the Court believes that C2C has improperly cited Fineman, and actually intended to cite the Supreme Court's decision in Kodak, which rejected the contention that a single brand of a product or service can never be a relevant market.  As such, we will address C2C's claim as referring to the Supreme Court's determination in Kodak.

The Kodak plaintiffs did not allege that the tying product was Kodak copiers, but that service and parts were two distinct markets, and that Kodak had used its monopoly power over the parts market as the tying product to compel the owners and users of Kodak equipment to use Kodak's own service personnel, rather than independent service organizations ("ISOs").  Kodak, 504 U.S. at 456-60.  Additionally, the record showed that Kodak had market power to raise prices and drive out competition in the after-markets, and the plaintiffs had presented evidence of customers being "locked-in" to Kodak products.  Id. at 456-58, 477-78.  The Court also accepted as a fact, based on the record, that parts for Kodak equipment were not interchangeable with other manufacturers' parts and thus, there was an issue whether Kodak used its parts sales as a tie to service, thereby inducing its equipment owners to use Kodak's service.  Queen City Pizza, 124 F.3d at 439.

The Kodak rationale for concluding that a single brand can constitute its own relevant market, because of the "unique" facts presented, is not applied where the plaintiff fails to allege a "lock-in" in an aftermarket.  See Brokerage Concepts, Inc. v. U.S. Healthcare, 140 F.3d 494, 513-14 (3d Cir. 1998) (refusing to define relevant product market as only U.S. Healthcare members with prescription drug benefits).  As such, Kodak "establishes that a single brand market may be considered the relevant market

45

where a legitimate class of consumers is locked in to purchasing a non-interchangeable tying product in a derivative market due to high switching costs in the primary market." Id. at 515 (citation omitted).  Here, there is no allegation by C2C that it is "locked-in" to Wu Mar cranes.  Only customer preference for Wu Mar cranes, and not compulsion by the product itself as in Kodak, leads a customer to purchase a Wu Mar crane.  Thus, the narrow exception established in Kodak for a one-brand relevant product market does not apply here.

C2C has also failed to demonstrate that Wu Mar cranes are unique and not interchangeable with other products or services. As C2C points out in its declarations, six other crane companies (excluding C2C and Coastal) manufacture cranes for sale within the United States.  (Balaban Decl., at ¶ 7.)  As such, these other companies are in direct competition with C2C in the sale of cranes.  There are also approximately twelve foreign crane manufacturers.  Moreover, the industry publication that Balaban refers to in his declaration, Play Meter 2004, when discussing the "state of the industry" includes amusement cranes in a broad category of games identified as "Prize Dispensing Games".  (Id. at ¶ 9.)

C2C's (and a few of its customers') personal preference for Wu Mar cranes, and an allegation that the cranes fall at the lower end of the market in terms of pricing, is not enough

46

"uniqueness" to show that Wu Mar brand cranes are their own market.  du Pont, 351 U.S. at 396.  Although C2C (through Balaban) provides numerous alleged differences between Wu Mar cranes and the alternative cranes, products do not need to be identical to be included in the same market — in other words, complete functional overlap is not required.  United States v. Grinnell Corp., 384 U.S. 563, 572-73 (1966); see also du Pont, 351 U.S. at 394 (stating that it is not a "proper interpretation of the Sherman Act to require that products be fungible to be considered in the relevant market").

C2C has not demonstrated that the relevant market in this case should be limited to Wu Mar cranes.  Accordingly, C2C's failure to define the proper relevant market under the "rule of reason" analysis is fatal to its request for injunctive relief.

**B.   Sherman Act § 2 Violation; Violation of NJAA § 56:9-4**

C2C asserts that the Coastal has monopolized the market for Wu Mar cranes in violation of Section 2 of the Sherman Act ("Section 2") and NJAA § 56:9-4.[24]  In support of its contention, C2C explains that: (1) the relevant product market should be limited to Wu Mar cranes, (2) Coastal — before Wu Mar's

----

[24] NJAA § 56:9-4 is also interpreted in accordance with federal case law interpreting Section 2.  NJAA § 56:9-4 provides, in relevant part: "It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market." Id.  This language essentially mirrors the language of Section 2.

termination of C2C as a distributor — enjoyed an 80% market share, and (3) Coastal's ability to control prices and pressure Wu Mar is evidenced in the e-mail correspondence.  The Court finds that C2C has failed to demonstrate a reasonable likelihood of success on the merits of its monopolization claims.

Section 2 states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade" is guilty of an offense and subject to criminal penalties.  Id.  To establish a violation under Section 2, C2C must show: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.[25]  Kodak, 504 U.S. at 481; see Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 380 (3d Cir. 2005) (citation omitted).

The acquisition of monopoly power provides the holder with "the power to control prices in the relevant market or to exclude competitors." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 595-97 (1985).  Concerning the first element, C2C

_____

[25] "Monopoly power under § 2 requires . . . something greater than market power under § 1." Kodak, 504 U.S. at 481. Nonetheless, the analysis to define relevant markets is similar — relevant markets under both sections are defined by the same two factors: "reasonable interchangeability of use and cross-elasticities of demand." Queen City Pizza, 124 F.3d at 442 (internal citations omitted).

must define and prove both a relevant product market and a relevant geographic market within which the defendants exert market power.  du Pont, 351 U.S. at 392-95.  The second element requires C2C to provide evidence of anticompetitive or exclusionary conduct by the defendants.  Aspen, 472 U.S. at 601-03.  To violate Section 2, a defendant must engage in illegal conduct "to foreclose competition, gain a competitive advantage, or to destroy a competitor."  Kodak, 504 U.S. at 482-83.

The defendants, as with the Section 1 argument, argue that C2C's proposed relevant product market definition of Wu Mar cranes is inappropriate.  The Court finds that C2C's monopolization claim, as its Section 1 claim, fails because of C2C's failure to establish a relevant product market.  C2C's proposed market of Wu Mar cranes ignores the economic realities of interchangeability of products or the cross-elasticity of demand, and incorrectly defines a market based on a single brand's product.  Accordingly, because C2C has improperly defined the relevant product market, C2C has not established a reasonable likelihood of success on the merits of its monopolization claims.

## C.   Tortious Interference with Prospective Economic Advantage

C2C claims that the defendants unlawfully interfered with C2C's business opportunities concerning its distribution of Wu Mar cranes — including crane sales, service and maintenance of the cranes, and the sale of incidental products.  Specifically,

49

C2C argues that the defendants interfered by "colluding in an effort to fix prices and ultimately by cutting off C2C's supply of Wu Mar Cranes." (C2C's Br., at 31.)   The Court finds that C2C fails to show a reasonable likelihood of success on this claim.

1.   Elements of a Tortious Interference with Prospective
     Economic Advantage Claim

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling or occupation free from undue influence or molestation." Printing Mart v. Sharp Elecs., 563 A.2d 31, 36 (N.J. 1989) (citations and quotations omitted).   The requisite elements of a claim for tortious interference with prospective economic advantage are: (1) the plaintiff had a reasonable expectation of economic advantage, (2) the defendant interfered intentionally and with malice, (3) the defendant's interference caused the loss of the plaintiff's prospective gain, and (4) damages.   Id. at 37. The Court will determine whether the defendants' actions constitute wrongful conduct or privileged competitive efforts.

A prospective economic advantage is defined as:

The expression, prospective contractual relation, is
not used [. . .] in a strict, technical sense.   It is
not necessary that the prospective relation be expected
to be reduced to a formal, binding contract.   It may
include prospective quasi-contractual or other
restitutionary rights or even the voluntary conferring
of commercial benefits in recognition of a moral
obligation.

* * *

50

> Included are interferences with the prospect of
> obtaining employment or employees, the opportunity of
> selling or buying land or chattels or services, and any
> other relations leading to potentially profitable
> contracts.

Id. at 39 (citation omitted).  Additionally, the term "malice" in

the second element is not defined for purposes of this tort in

the literal sense; rather, it means that "the harm was inflicted

intentionally and without justification or excuse." Id. at 37

(citation omitted).  As such, the relevant inquiry is whether the

defendants' conduct was sanctioned by the "rules of the game."

Harper-Lawrence, Inc. v. United Merchants & Mfrs., 619 A.2d 623,

630 (N.J. App. Div. 1993).  As for the third element, causation,

C2C must demonstrate that "if there had been no interference

there was a reasonable probability that the victim of the

interference would have received the anticipated economic

benefits." Leslie Blau Co. v. Alfieri, 384 A.2d 859, 865 (N.J.

App. Div. 1978) (citation omitted).

2.   C2C's Claim Against Coastal

     C2C contends that it has satisfied all of the aforementioned

elements.  C2C claims that (1) it had a reasonable expectation of

economic advantage in the crane sales it would have had if it

were able to sell Wu Mar cranes; (2) the defendants acted

intentionally and with malice because their conduct constituted

unlawful price fixing; and (3) Coastal coerced Wu Mar to

terminate its relationship with C2C and that this termination

caused C2C to lose sales and the good will of its customers.
(C2C's Br., at 30-31.)

Coastal denies that C2C has demonstrated a reasonable
likelihood of success on the merits of its tortious interference
with prospective economic relationship claim.  Coastal also
contends that it is "shielded from the tortious interference
claims by the cloak of competitor's privilege." (Coastal's Br.,
at 35.)  Generally, the competitor's privilege provides that
"[w]hile a party does have a right to enjoy the fruits and
advantages of its own labor without unjust interference, a party
has no right to be protected against competition." E Z Sockets,
Inc. v. Brighton-Best Socket Screw Mfg., 704 A.2d 1364, 1370
(N.J. Super. 1996) (citations and quotations omitted).
"Conversely, where a plaintiff's loss of business is merely the
incident of healthy competition, there is no compensable tort
injury." Ideal Dairy Farms v. Farmland Dairy Farms, 659 A.2d 904,
933 (N.J. App. Div. 1995) (citation omitted).  Under the
competitor's privilege, a competitor may lawfully compete within
the following parameters:

> Competition as Proper or Improper Interference
> (1) One who intentionally causes a third person not to
> enter into a prospective contractual relation with
> another who is his competitor or not to continue an
> existing contract terminable at will does not interfere
> improperly with the other's relation if
> (a) the relation concerns a matter involved in the
> competition between the actor and the other and
> (b) the actor does not employ wrongful means and
> (c) his action does not create or continue an unlawful

       restraint of trade and
       (d) his purpose is at least in part to advance his
       interest in competing with the other.

E Z Sockets, 704 A.2d at 1370 (citation omitted).  Therefore, the

Court will analyze the above requirements to determine if Coastal

is protected by the competitor privilege.

    C2C and Coastal are competitors regarding the distribution

and sale of Wu Mar cranes and amusement cranes in general.  Also,

the Court has already determined that C2C has not shown that the

defendants created an unlawful restraint of trade.  Moreover,

aside from the alleged antitrust violations, C2C has proffered no

evidence that suggests that the defendants employed wrongful

means.  Wrongful means "includes, violence, fraud, intimidation,

misrepresentation, criminal or civil threats, and/or violations

of the law." Id. (citation omitted).  Here, the Court has already

concluded that the defendants did not violate any antitrust laws,

and there is no evidence that the defendants employed any

"wrongful means."

    The Court is also satisfied that Coastal's motive was to

protect the return on its investment in Wu Mar cranes and to

prevent any free riders from taking advantage of its

contributions, which in effect enhances competition.  Both

parties acknowledge that through Wu Mar, Coastal was able to grow

and prosper in the crane market.  It is therefore understandable

that because of its substantial financial commitment to Wu Mar,

Coastal would want to beat the competition.  However, unless Coastal employed wrongful means to do so, Coastal is insulated from C2C's tortious interference claim under the cloak of competitor's privilege.  Accordingly, because C2C has not presented any evidence of wrongful means other than that alleged in its antitrust claim, and in light of the standard for a preliminary injunction, C2C has not established a reasonable likelihood of success on the merits of this claim against Coastal.

3.   <u>C2C's Claim Against Wu Mar</u>

Wu Mar claims that C2C cannot (1) direct a claim for tortious interference against Wu Mar because Wu Mar was a party to the alleged relationship with C2C, and (2) show that Wu Mar acted with malice.  (Wu Mar's Br., at 20-22.)  Wu Mar is incorrect that C2C cannot assert a tortious interference claim against it.  Generally, a tortious interference claim must "be directed against defendants who are not parties to the relationship." <u>Printing Mart</u>, 563 A.2d at 37.  In this instance, C2C is claiming that Wu Mar interfered with C2C's relationship with C2C's crane customers.  C2C is not claiming that Wu Mar tortiously interfered with C2C's relationship with Wu Mar.  <u>See, e.g.</u>, <u>Hurley v. Atl. City Police Dep't</u>, Nos. 93-260 & 94-1122, 1995 WL 854478, at *13 (D.N.J. Aug. 4, 1995) (concluding that plaintiff could not maintain claim for interference with employment relations against defendant, Atlantic City Police

54

Department ("ACPD") because "ACPD is a party to the employment contract between itself and plaintiff").

C2C, as discussed in the Court's Section 1 analysis, has failed to demonstrate that Wu Mar acted with malice in terminating C2C as a distributor.  Wu Mar had numerous independent business justifications for terminating C2C as a distributor and in choosing Coastal as its exclusive distributor in the United States.  As such, C2C has not shown a reasonable likelihood of success on the merits of its tortious interference with prospective economic relations claim against Wu Mar.

**D.   Tortious Interference with Contract**

C2C argues that Coastal tortiously interfered with its contract with Wu Mar.  C2C contends that it had a "contractual relationship with [Wu Mar], whereby [Wu Mar] would fulfill C2C's purchase orders for Wu Mar Cranes as the orders were received." (C2C's Br., at 32.)  C2C claims that Coastal interfered with this contract because it complained to Wu Mar about C2C undercutting Coastal's prices and competing with Coastal.  (Id.)  The Court finds that C2C fails to demonstrate a reasonable likelihood of success on the merits of this claim.

C2C, to establish a claim for tortious interference with contractual relations, must prove: (1) actual interference with a contract, (2) malice, and (3) actual damages.  Cox v. Simon, 651 A.2d 476, 483 (N.J. App. Div. 1995).  Concerning malice, "[a]n

individual acts with malice when he or she intentionally commits a wrong without excuse or justification." Id.  Moreover, a party's conduct is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Dello Russo, M.D. v. Nagel, 817 A.2d 426, 434 (N.J. App. Div. 2003) (citations and quotations omitted).  "However, the fact that a breaching party acted to advance [its] own interest and financial position does not establish the necessary malice or wrongful conduct." Id. (citations omitted).

Coastal contends that C2C has failed to demonstrate a reasonable likelihood of success on the merits of this claim because: (1) C2C and Wu Mar did not have a contractual relationship, and (2) C2C has not demonstrated that Coastal acted with malice.  The Court concludes that Coastal is correct. First, although C2C claims that it had a contractual relationship with Wu Mar, C2C has failed to provide any evidence of the terms of any such agreement.  C2C has not provided the Court with a written agreement.  In addition, C2C has proffered no evidence that either: (1) Wu Mar was obligated to fill C2C's orders for cranes, or (2) C2C was obligated to purchase its cranes from Wu Mar.  As such, C2C has not provided the Court with sufficient evidence to conclude that it had a contractual relationship with Wu Mar.  Second, as discussed above in reference to C2C's

56

tortious interference with prospective economic relations claim,
C2C has not demonstrated that Coastal acted with malice.
Therefore, C2C has not demonstrated a reasonable probability of
success on the merits of this claim.

**E.   Breach of Duty of Good Faith and Fair Dealing**

C2C contends that Wu Mar breached its implied covenant of
good faith and fair dealing by terminating C2C's distributorship
of Wu Mar cranes without proper notice.  In addition, C2C asserts
that Wu Mar's decision to terminate C2C was "beyond the risks
that C2C could anticipate in the normal business relationship."
(C2C's Br., at 35.)  The Court finds that C2C has failed to prove
a likelihood of success on the merits of this claim.

"[E]very contract in New Jersey contains an implied covenant
of good faith and fair dealing." <u>Sons of Thunder, Inc. v. Borden,
Inc.</u>, 690 A.2d 575, 587 (N.J. 1997) (citations omitted).  The
covenant of good faith and fair dealing is defined as:

> In every contract there is an implied covenant that
> neither party shall do anything which will have the
> effect of destroying or injuring the right of the other
> party to receive the fruits of the contract; in other
> words, in every contract there exists an implied
> covenant of good faith and fair dealing.
>
> However, in the absence of a contract, there can
> be no breach of an implied covenant of good faith and
> fair dealing.  The obligation to perform in good faith
> exists in every contract including where the contract
> is terminable at will.
>
> While we have not developed a definition of good
> faith and fair dealing for all cases, recently our
> Supreme Court gave guidance in this area.  The Court
> explained:

> What constitutes good faith performance and
> fair dealing has been the subject of
> considerable analysis.  For transactions
> involving merchants and the sale of goods,
> the Uniform Commercial Code has defined good
> faith as honesty in fact and the observance
> of reasonable commercial standards of fair
> dealing in the trade.  The Restatement
> (Second) of Contracts notes that every
> contract imposes on each party a duty of good
> faith and fair dealing in its performance and
> enforcement.  A comment to the Restatement
> states that good faith performance or
> enforcement of a contract emphasizes
> faithfulness to an agreed common purpose and
> consistency with the justified expectations
> of the other party; it excludes a variety of
> types of conduct characterized as involving
> bad faith because they violate community
> standards of decency, fairness or
> reasonableness.

The Court emphasized that bad motive or intention is essential.

Wade v. Kessler Inst., 778 A.2d 580, 584-85 (N.J. App. Div. 2001) (internal citations and quotations omitted).  As such, to sustain a successful claim for breach of the implied covenant of good faith and fair dealing, C2C is required to show that: (1) a contract existed between C2C and Wu Mar, and (2) Wu Mar breached the covenant of good faith and fair dealing in the contract.

Wu Mar alleges that C2C cannot show that a contract existed between it and Wu Mar.  (Wu Mar's Br., at 22.)  Specifically, Wu Mar argues that C2C simply purchased cranes on an "ad hoc" basis and Wu Mar was free to reject C2C's orders at any time.  (Id.) In addition, Wu Mar contends that C2C's reliance on BAK-A-LUM Corp. of America v. Alcoa, 351 A.2d 349 (N.J. 1976) is misplaced.

58

C2C relies on BAK-A-LUM in support of its contention that it was entitled to reasonable notice that Wu Mar was terminating C2C as a distributor.  However, as C2C admits, BAK-A-LUM, involved an exclusive distributorship agreement, which C2C did not have with Wu Mar.  (C2C's Br., at 34-35.)  Nonetheless, C2C argues that it did have a distributorship agreement and that it was entitled to reasonable notice of any termination.  (Id.)  C2C has provided the Court with no evidence of a distributorship agreement with Wu Mar, and C2C's conclusory statement in its briefs that it had such a relationship is insufficient to establish an agreement. Moreover, although C2C only received two days notice that Wu Mar would no longer sell cranes to it, C2C was able to purchase five containers of Wu Mar cranes, thus allowing C2C to continue selling Wu Mar cranes through August, 2005, approximately six months after Wu Mar notified C2C that Wu Mar would no longer accept purchase orders.  During this six month period, C2C was able to fill (and C2C has not alleged otherwise) all of its orders for Wu Mar cranes, and was able to (1) investigate manufacturing its own cranes for sale, and (2) locate a possible replacement manufacturer.  As such, any lack of notice was rendered harmless by C2C's subsequent purchase of Wu Mar cranes. Accordingly, C2C has failed to establish a reasonable likelihood of success on the merits of this claim.[26]

---

[26] C2C has not brought a claim for breach of contract against Wu Mar.

## II.  **Irreparable Injury**

C2C claims that it will suffer indeterminable damages and lose the good will that it developed as a Wu Mar crane distributor if the Court does not grant injunctive relief.  Also, C2C asserts that, despite its current business relationship with Feiloli, C2C (1) has not been able to find a replacement manufacturer with the ability to manufacture cranes of the same quality and design as the Wu Mar cranes, and (2) is practically out of Wu Mar cranes.  (Balaban Decl., at ¶¶ 55, 57.)  The Court finds that C2C has not established the existence of irreparable injury supporting the issuance of injunctive relief.[27]

"[A] failure to show a likelihood of success . . . must necessarily result in the denial of a preliminary injunction."  Morton v. Beyer, 822 F.2d 364, 371 (3d Cir. 1987).  The Court, having concluded that C2C has not demonstrated a reasonable likelihood of success on the merits of its claims, need not determine whether C2C has satisfied the remaining requirements

---

[27] The defendants' contention that C2C delayed in seeking injunctive relief is unsupported by the evidence.  "[D]elay is relevant in assessing irreparable harm, and that a preliminary injunction may be an inappropriate remedy where the non-movant provides proof of the movant's unexplained delay."  Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P., 292 F.Supp.2d 611, 622 (D.N.J. 2003) (citations and quotations omitted).  Here, however, following Wu Mar's refusal to provide C2C with cranes, C2C and Coastal engaged in discussions involving, inter alia, C2C purchasing Wu Mar cranes through Coastal.  After those discussions fell apart, C2C did not delay in seeking injunctive relief.

for preliminary injunctive relief.  Forum for Academic & Inst'l Rights v. Rumsfeld, 291 F.Supp.2d 269, 322 (D.N.J. 2003). Because C2C has failed to establish a sufficient probability of success, the denial of preliminary injunctive relief is appropriate even without specifying any findings of fact and conclusions of law as to the other factors.  Nonetheless, due to the importance of this matter to all parties, as well as the extensive discussion of these additional factors in their briefs, the Court briefly addresses whether C2C has shown that it will suffer irreparable harm absent a preliminary injunction.[28] Particularly because of the lack of a reasonable likelihood of success on the merits of C2C's allegations, the Court finds that this additional factor does not support injunctive relief.

A party seeking a preliminary injunction must generally make "a clear showing of immediate irreparable injury." Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989). "[T]o show irreparable harm, the plaintiff must demonstrate potential harm which cannot be redressed by a legal remedy." Instant Air Freight, Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989).  "The requisite feared injury or harm must be irreparable--not merely

---

[28] The Court is not required to issue findings regarding the balance of the hardships and the public interest when the party seeking a preliminary injunction does not establish both a reasonable likelihood of success and irreparable harm.  See, e.g., Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994).

serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (citations and quotations omitted).  "The availability of adequate money damages belies a claim of irreparable injury." Frank's GMC, 848 F.2d at 102.

C2C has not demonstrated that its losses, if any, cannot be compensated by money damages.  Although C2C is correct that 15 U.S.C. § 16 provides for injunctive relief to protect an antitrust litigant from "'threatened loss or damage' from current and future violations of the antitrust laws," C2C has failed to demonstrate a current or future antitrust violation.  As such, C2C has not demonstrated "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to occur." Weiss v. York Hosp., 745 F.2d 786, 829 (3d Cir. 1984).

C2C also asserts that without injunctive relief (1) its good will in the crane industry will be destroyed, and (2) it will lose its crane business.  C2C has failed to introduce sufficient evidence to support these contentions.  First, C2C has introduced minimal evidence that its reputation or good will in the crane industry would be damaged in any significant way by the denial of injunctive relief.  In support of its contention that it will lose customer good will, C2C points to four of its customers that

have allegedly rejected the alternative cranes and asked for Wu Mar cranes.  (Maurer Decl., at ¶ 7.)  This evidence, however, does not provide the Court with sufficient evidence to conclude that C2C will lose its reputation in the crane industry without injunctive relief.  At best, this evidence demonstrates that a few of C2C's customers do not prefer the alternative cranes over Wu Mar cranes, but this does not demonstrate any potential loss of good will.

C2C's reliance on Bascom Food Products Corp. v. Reese Finer Foods, Inc., 715 F.Supp. 616 (D.N.J. 1989) and Atlantic City Coin & Slot Co., Inc. v. IGT, 14 F.Supp.2d 644 (D.N.J. 1998) in support of its argument that loss of business or loss of consumer good will necessitates a finding of irreparable harm is misplaced.  First, unlike the plaintiff in Bascom Food, C2C has failed to demonstrate that Wu Mar cranes are unique and that C2C would be unable to compete in the crane business without Wu Mar cranes.  Instead, C2C has admitted that it could produce "comparable" cranes to Wu Mar cranes, but that it would cost C2C more money to do so.[29]  (Balaban Decl., at ¶ 53.)  Second, in Bascom Food, the plaintiff submitted certifications from non-party retailers and distributors who attested that "there are no

---

[29] C2C has not indicated that Feiloli (or any other foreign crane manufacturer), the manufacturer of the alternative cranes (which C2C purchases for a substantially lower price than Wu Mar's cranes), is unwilling or unable to design the alternative cranes to meet C2C's needs.

reasonable substitutes" for the defendant's products and that the defendant's product was "virtually impossible to substitute." 715 F.Supp. at 633-34.  Here, C2C has introduced no evidence from non-party witnesses indicating that there are no reasonable substitutes for Wu Mar cranes.  Rather, C2C has provided evidence that a few of its customers prefer Wu Mar cranes and that alone does not indicate that there are no reasonable substitutes. C2C's only evidence that Wu Mar cranes hold a unique place in the market is in the form of declarations from its own managers. Finally, the plaintiff in <u>Bascom Food</u> was a new business with no prior record of sales.  Here, C2C has been selling cranes since 1999 and can more easily determine its lost sales or lost potential sales.  Thus, the Court finds that this evidence is insufficient to support C2C's allegation that Wu Mar cranes hold a unique place in the market.

The <u>Atlantic Coin</u> court concluded that injunctive relief was appropriate because the plaintiff demonstrated that the parties had a special relationship and a special way of doing business. C2C has made no such showing that it had a special relationship and a special way of doing business with Wu Mar.

C2C has established, even taken in the light most favorable to C2C, the potential loss of its crane business but, as discussed above, C2C has not established that these potential losses are not compensable by money damages.  Accordingly, C2C

has failed to demonstrate that it will suffer immediate, irreparable harm without the issuance of preliminary injunctive relief.

### CONCLUSION

C2C has failed to establish its entitlement to a preliminary injunction against the defendants (1) reinstating the contractual relationship between C2C and Wu Mar, (2) enjoining Wu Mar from failing and refusing to provide C2C with Wu Mar cranes, consistent with orders placed by C2C, (3) restraining Coastal and Wu Mar from setting or controlling the prices at which C2C may sell Wu Mar cranes, and (4) restraining the defendants from controlling the customers to whom C2C may sell Wu Mar cranes. C2C has not shown a reasonable likelihood of success on the merits regarding any of its claims or that it will suffer immediate, irreparable harm without the issuance of preliminary injunctive relief.  Therefore, the Court will deny C2C's motion for a preliminary injunction in an appropriate order.


          s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

65